**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIE BUENO, DARLENE HOLLINS, and DAVID BUENO, individually and as representatives on behalf of a class of similarly situated persons, | Civil Action No.  1:24-cv-822 (GTS/DJS) |
| *Plaintiffs*, | **COMPLAINT—CLASS ACTION** |
| v. | JURY TRIAL DEMANDED |
| GENERAL ELECTRIC COMPANY, THE BOARD OF DIRECTORS OF GENERAL ELECTRIC COMPANY, H. LAWRENCE CULP, JR., THE GENERAL ELECTRIC COMPANY PENSION BOARD, THE COMMITTEE, AND JOHN DOES 1–5, | |
| *Defendants*. | |

1.  Plaintiffs Julie Bueno, Darlene Hollins, and David Bueno, individually and as representatives of a class of similarly situated persons whose benefit payments were transferred from the GE Pension Plan (n/k/a the GE Aerospace Pension Plan, the "Plan"), bring this action against Defendants General Electric Company (operating as GE Aerospace, "GE"), the Board of Directors of General Electric Company, H. Lawrence Culp, Jr., the General Electric Company Pension Board, the Committee, and John Does 1–5 (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.  ERISA imposes strict fiduciary standards of conduct on fiduciaries, which are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). Plan fiduciaries must act both prudently and loyally, "solely in the interest" of participants and beneficiaries of the plan. 29 U.S.C. § 1104(a)(1). They must make fiduciary decisions with "an

eye single to the interests of the participants and beneficiaries," instead of favoring their own

interests. *Bierwirth*, 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), II Scott on

Trusts §170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed.

1978)) (citation omitted).

3.      On December 15, 2020, GE announced the transfer to Athene Annuity and Life

Co. or Athene Annuity & Life Assurance Company of New York (collectively "Athene") of over

$1.7 billion of GE's pension obligations. Athene is a highly risky private equity-controlled

insurance company with a complex and opaque structure. This transaction affected over 70,000

GE retirees and their beneficiaries who depended on GE to guarantee their pension benefits

through retirement. By offloading GE's pension obligations to Athene, Defendants caused

Plaintiffs and similarly situated participants and their beneficiaries to lose their status as

"participants" in the ERISA-governed Plan, and, therefore, become no longer entitled to ERISA's

protections for employee retirement benefits. Although ERISA does not prohibit an employer

from transferring pension obligations to an insurance company, ERISA does require that a

fiduciary obtain the "safest annuity available." 29 CFR § 2509.95-1.

4.      Defendants did not select the safest annuity available to ensure long-term

financial security for GE retirees and beneficiaries. Instead, Defendants selected Athene, which

is substantially riskier than numerous traditional annuity providers. Annuities issued by Athene

are structured to generate higher expected returns by investing in lower-quality, higher-risk assets

without the traditional mix of quality assets to support future benefit obligations. This strategy

creates significant risk at a great cost to retirees. Because the market devalues annuities when

accounting for such risk, it is likely that GE saved a substantial amount of money by selecting an

Athene annuity instead of the actual safest annuity available. In transferring Plaintiffs' pension

benefits to Athene, Defendants put the future retirement benefits owed to GE retirees and their beneficiaries at substantial risk of default. This risk was not compensated and devalued their pensions. Accordingly, Plaintiffs seek the monetary value of the reduced market value of Athene's annuities relative to the value of the safest available annuity.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transactions and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.      **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by an established, multi-billion-dollar corporation, and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much

3

higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.      **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, on information and belief, at least one of the alleged breaches took place, and where at least one Defendant resides or may be found.

## PARTIES

### I.      The GE Pension Plan (n/k/a GE Aerospace Pension Plan)

9.      On November 9, 2021, General Electric Company announced a strategic plan to operate as three separate publicly traded companies from its three lines of business: (1) aerospace; (2) energy; and (3) healthcare. Through two separation agreements, the company spun off its energy and healthcare businesses to form GE Vernova (NYSE: GEV) on January 3, 2023, and GE Healthcare (NYSE: GEHC) on April 2, 2024. The aerospace business remained with General Electric Company and now operates as GE Aerospace.

10.     In preparation for the separation of the three businesses, the Plan was split into three separate plans effective January 1, 2023: (1) GE Aerospace Pension Plan (the new name of the Plan); (2) the GE Healthcare Pension Plan; and (3) the GE Energy Pension Plan. As of December 31, 2022, and for years prior, the plan at issue was known as the "GE Pension Plan."

11.     At all relevant times, the Plan was a defined benefit, employee benefit pension plan under 29 U.S.C. § 1002(2)(A) and § 1002(35). Prior to January 1, 2023, the Plan covered

eligible employees of GE and participating affiliated companies. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

12.     As of 2020, before the buy-out transaction at issue, the Plan covered 289,881 total participants and held nearly $59 billion in net assets available for Plan benefits.

## II.   Plaintiffs

13.     Plaintiff Julie Bueno resides in Canal Fulton, Ohio, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Bueno was employed at GE starting in approximately 1978 and maintained her employment with the company until 1989, at which time she held the position of Accounting Clerk. Ms. Bueno is currently receiving her pension payments from Athene.

14.     Plaintiff Darlene Hollins resides in Sacramento, California, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Hollins was employed by GE as a courier before retiring in 2005. Ms. Hollins is currently receiving her pension payments from Athene.

15.     Plaintiff David Bueno resides in Canal Fulton, Ohio, and is a current participant in the Plan under 29 U.S.C. § 1002(7). Mr. Bueno is the beneficiary of Ms. Bueno's pension benefits from Athene. He was employed at GE from 1986 through 2016.

## III.   Defendants

16.     General Electric Company (NYSE: GE) (operating as GE Aerospace) is a publicly traded company that supplies aircraft engines. GE is headquartered in Evendale, Ohio, and incorporated in Schenectady, New York. At the time of the transaction at issue, and prior to the separation of GE's lines of business, GE was headquartered in Boston, Massachusetts. As of December 31, 2020, GE employed approximately 174,000 employees with operations in more than 170 countries. It recorded a profit of $7.3 billion during 2020.

17.     GE is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1002(16)(B). In December 2020, GE entered into an agreement with Athene under which GE agreed to purchase a group annuity contract to transfer defined benefit pension obligations to Athene. As alleged herein, GE exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.     The Board of Directors of General Electric Company (the "Board of Directors") has the authority to contract with an insurance company or companies to provide the benefits payable under the Plan, establish a committee appointed to serve at the pleasure of the Board, and appoint members to the General Electric Company Pension Board and the Committee, among other duties. As alleged herein, the Board of Directors exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     H. Lawrence Culp, Jr. is the acting Chief Executive Officer of GE and held the same position at the time of the transaction at issue. Mr. Culp was the Chairman of the Board of Directors at the time that the transaction occurred. As alleged herein, Mr. Culp exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     The General Electric Company Pension Board (the "Pension Board") consists of four or more individuals appointed annually by the Board of Directors to serve at the pleasure of the Board of Directors. The Pension Board has the authority to control and manage the operation and administration of the Plan. Plaintiffs are currently unaware of the identities of the individual members of the Pension Board. Accordingly, as alleged herein, the Pension Board exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.     The Committee has the authority to appoint one or more investment managers with the authority to manage and control the assets of the Plan. The Committee consists of one or more members who are appointed by the Board of Directors to serve at the pleasure of the Board of Directors. Plaintiffs are currently unaware of the identities of the individual members of the Committee or the formal name of the Committee. Accordingly, as alleged herein, the Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.     John Does 1–5 are unknown members of the Pension Board, members of the Committee, and any other Plan fiduciaries that exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting

management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

23.    Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a).

### ERISA'S FIDUCIARY STANDARDS

24.    ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably a duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a)(1). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25.    The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. To fulfill the duties to act solely in the interest of participants and

for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available," among other requirements. *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

26.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered per se violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### I.     Pension Risk Transfers ("PRT")

27.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.,* 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's predominant retirement system when ERISA was enacted in 1974.

28.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically a monthly payment, after retirement. Generally, employers are responsible for funding the pension plan to pay their benefit obligations to retirees. The amount of retirement benefits provided to employees is based on a formula that considers factors such as salary and years of service, among others.

29.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. Whereas participants bear

that risk in a defined contribution plan, in a pension plan, the risk is borne by the employer (or plan sponsor). If plan assets are inadequate to satisfy liabilities for benefit payments, the employer has an obligation to make additional contributions to the plan until ERISA's funding requirements are met.

30.     In recent years, employers have increasingly sought to reduce their pension funding risk through PRT transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

31.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a critically important fiduciary function. This decision will have a lasting impact on retirees and their beneficiaries for the rest of their lives. As NISA Investment Advisors noted, it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."

32.     PRT transactions can take one of three forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the plan by an insurer. As discussed below, the PRT transaction at issue involved a partial buyout.

## II.     The Risks Associated with PRT Transactions

### A.     Lack of ERISA and PBGC Protections

33.     Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are protected by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

34.     Plan sponsors of ERISA-governed defined benefit plans are required to pay PBGC premiums, on which the PBGC relies in the event that a plan sponsor becomes insolvent. PBGC premium obligations disappear when a PRT transaction occurs. Not only does this leave affected pensioners without PBGC protections, but it poses a funding risk to the PBGC, therefore threatening the level of protection offered to those participants still protected by the PBGC.

35.     SGAs offer less protection than the PBGC as they are not pre-funded. Rather, funding for SGAs comes from assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 in present value of annuity benefits, which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. For some annuitants, the situation is even worse. Plaintiff Hollins, a retiree living in California, would be subject to the so-called "California haircut"—the annuitant automatically loses 20%, as the maximum benefit is only 80% of the present value of the annuity.[1]

---

[1] *See* Exhibit A to Bulletin 96-02; CA Ins. Code § 1076.17(b)(1), https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/bulletin-96-02.cfm#exhibita.

**B.      Risk of Insolvency and Executive Life**

36.      This risk of insolvency is not merely hypothetical. The 1991 collapse of

Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially

catastrophic consequences of high-risk insurance practices. Similar to the alleged conduct

involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of

thousands of policyholders by seizing on a competitive advantage: declaring interest rates on

single-premium, deferred annuities that far exceeded industry averages.

37.      In 1991, over 300,000 policyholders relied on Executive Life, which at the time

held an A+ rating for financial soundness, for regular payments. But in 1990, Executive Life's

bond portfolio "cratered amid a bond market meltdown" before its 1991 seizure by the California

insurance commissioner. Following the seizure, the California insurance commissioner sold

Executive Life's investment portfolio to Leon Black, co-founder of Apollo Global Management

("Apollo"), for approximately half its value. Apollo is the parent company of Athene. Losses to

policyholders as a direct result of the Executive Life takeover were extreme, with policyholder

damages estimated at $3.9 billion.

38.      Leon Black was the co-head of brokerage firm Drexel Burnham Lambert

("Drexel"). First Executive Corp., the parent company of Executive Life of California and

Executive Life of New York, was Drexel's largest buyer of junk bonds. In contrast to most

insurance companies that invested in safer assets, such as high-grade bonds, mortgage securities,

and government obligations, Executive Life invested in risky junk bonds with high interest rates.

Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard

24% at the time of its collapse. This risky behavior allowed Executive Life to make higher

payouts to policyholders.

39.     By 1990, many of the Executive Life assets meant to fulfill payment obligations were in distress and trading for significantly less than their purchase price. When questioned on the risky makeup of their bond portfolio, Executive Life often pointed to their "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's.

40.     Up until a week before Executive Life's seizure, it maintained a "contingent B-plus" rating from AM Best, meaning it was still considered "'very good'" despite a decline in position pending review. Less than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it only took weeks for parent company First Executive to file for bankruptcy. Executive Life and ratings agencies obscured the true riskiness of Executive Life's bond portfolio.

41.     Executive Life ultimately was declared insolvent in 2012. In August 2013, the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. GABC continues to make payments to annuitants. However, a large number of annuitants experienced losses of 50% or more of their annuity payments.[2] Notably, the Executive Life Restructuring Agreement indicates that GABC is expected to make reduced annuity payments to annuitants for another 50 years.

**C.     Response to Executive Life and Interpretative Bulletin 95-1**

42.     In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). The amendment created a right of action to obtain appropriate relief for ERISA violations involving

---

[2] *See* Agreement of Restructuring in Connection with the Liquidation of Executive Life Insurance Company of New York, Apr. 23, 2023, and Schedule 1.15 (List of Contracts).

the "purchase of an insurance contract or insurance annuity," including "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

43.     As noted, the Department of Labor's Interpretive Bulletin 95-1 establishes a framework for ERISA compliance when choosing an annuity provider in a PRT transaction. 29 CFR § 2509.95-1. The Department of Labor has instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise."

44.     In order to determine the safest available annuity, Interpretive Bulletin 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through state guaranty associations. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.

### D.   Private Equity Firms

45.     Traditional players in the PRT market include traditional life insurance and annuity providers, such as New York Life Insurance Company ("New York Life"). However, private equity firms have taken on a growing role in the PRT landscape through both the purchasing of life insurers and serving as third-party asset managers for insurers.

46.     The mission of private equity does not align with the interests of annuitants. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, but they can also generate enormous investment management fees for themselves. They focus on maximizing their immediate financial returns rather than ensuring guaranteed pension benefits to annuitants.

47.     The United States Department of the Treasury expressed concerns of a potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of Interpretive Bulletin 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans (the "Council"). During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

48.     As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015. Lawmakers and industry experts are concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."

49.     In the wake of the recent surge in life insurer liabilities and annuity sales spurred on by PRT transactions, some life insurers backed by private equity have reported extremely

small surpluses relative to the risk profile of the assets held in their portfolios. The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the insurers' portfolio, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yield investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem more attractive.

### III.   Athene and its Financial Risks

50.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and  Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

51.     On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo.

A.     **Athene's Complex Investment Structures and Ratings**

52.     Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which are headquartered in Hamilton, Bermuda. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero.

53.     For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to Federal Reserve Board economists, insurance companies like Athene hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers.

54.     Annuity and life insurance companies maintain surpluses to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, acts as the only barrier between solvency and insolvency. In order to determine whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities.

55.     As of year-end 2023, Athene's surplus-to-liability ratio stood at 1.44%. In contrast, a traditional insurer, such as New York Life, maintained a surplus-to-liability ratio of 12.24%. The national average is over 7%. Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers, and, as such, annuitants whose pensions have been transferred to Athene assume a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

56.     Athene touts its ample surplus, but this is misleading. When Athene discusses its surplus, it is speaking of that of Athene Holding Ltd., the holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which, as discussed *supra*, is among the thinnest in the country. Athene's total liabilities have also increased by more than 250% from 2018–2023. However, the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. A proper investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider.

57.     Athene also has a high concentration of risky assets relative to its surplus. For 2022, Athene reported $21 billion in "other loan-backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, which was less than its $23.88 billion surplus.

58.     Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

59.     Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset managers (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buyout, and then cedes its insurance liabilities to an affiliated offshore reinsurer located in Bermuda or another favorable jurisdiction (*e.g.,* Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt.

60.     Bermuda reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("SAP"). Bermuda does not follow the same detailed reporting standards. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda, Athene's affiliated reinsurers report only aggregate data without individual purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP.

61.     While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Rather than reinsuring through a third-party reinsurer to diversify risk, Athene chooses to cede reinsurance to captive affiliates. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus.

62.     Beyond traditional reinsurance, Athene engages in significant Modified Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital requirements associated with its asset risks to a reinsurer while retaining the assets themselves. In 2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9 billion in surplus. In contrast, other insurers, such as New York Life and TIAA, reported no ModCo with offshore affiliates in 2022 and 2023.

63.     Conducting ModCo transactions with Bermuda-based captive reinsurers, like Athene Life Re, simply involves swapping insurance risks among commonly controlled

companies in order to avoid SAP requirements and artificially inflate Risk-Based Capital ("RBC") ratios. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. RBC ratios are inflated because ModCo arrangements allow Athene to remove risky assets from its RBC ratio. And the use of higher-risk assets enables Athene to value its liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through an ultimately circular ModCo transaction, Athene obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus.

64.     The interdependence among Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. In the event that Athene's separate account and then general account would be insufficient to cover its liabilities, Athene would be forced to seek payment from its affiliated reinsurer for a portion of the annuity liabilities. This close correlation is further evidence of Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, which is itself. An inability to satisfy Athene's general account obligations would cause a downgrade in its credit rating, preventing it from raising funds in the credit markets.

65.     Tom Gober, a Certified Fraud Examiner and Insurance Examiner with significant experience working both for and with government entities, conducts extensive studies of PRT transactions through close examination of life insurers' regulatory filings. His work in the PRT space has led him to believe that affiliated transactions, such as those between Athene and Athene Life Re, are a significant problem facing the PRT space.

66.    Gober conducted an analysis of Athene's transfer activity among affiliates. His conclusions further illustrate the heightened risk of Athene due to the interdependence among captive affiliates. Gober found that Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If "only a fraction" of that reinsurance transferred in 2021 were disallowed, "Athene would face a funding shortfall." A funding shortfall for Athene would directly impact Apollo because Athene insurance companies represent 40% of Apollo's value.

67.    Athene's separate accounts used to first pay pension benefits to retirees are not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other PRT transactions, the separate accounts hold assets supporting the contracts. However, the assets in a given separate account may be used to support Athene's payment obligations under other separate GACs issued by Athene. On a quarterly basis, but no less frequently than annually, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

68.    Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies. "Such PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]"  Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

69.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. Provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company and, by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

70.     Athene's PRT business has also been subject to regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state. Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, Athene was ordered to pay a $45 million civil monetary penalty and meet other provisions.

**B.    Athene's Creditworthiness**

*1.    Objective measures illustrate that Athene is not the safest available annuity.*

71.     On October 13, 2022, NISA Investment Advisors ("NISA") reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene.[3] NISA performed its evaluation consistent with the framework outlined by Interpretive Bulletin 95-1. The report found that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk.

72.     To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding

---

[3] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

"the range of credit risk costs reaching as high as 14%." As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last among the represented annuity providers.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

73.    The NISA report demonstrates that Athene is a much riskier choice than traditional annuity providers. NISA found the economic loss to beneficiaries to be 14% when Athene was chosen as the annuity provider.

74.    Other objective measures from the NISA report similarly illustrate that Athene could not have been the safest available annuity provider. The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. Athene had the highest reported spread of 214 basis points ("bps"). All else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower

spread. But for annuitants in a PRT transaction, they are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider, such as Athene.

75.     Athene was also classified by NISA as a "Questionable Candidate" that "demands extenuating circumstances" to support its selection as the annuity provider in a PRT transaction. Its reported market spread, market price for risks assumed, and measure of economic loss to annuitants are all significantly higher than the same measures for other annuity providers, including New York Life. At least three providers were found to be "Clear Candidates" for a PRT transaction. Among annuity providers examined, Athene cannot be considered the "safest available" annuity.

76.     Interpretive Bulletin 95-1 also makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." In light of this guidance, NISA separately compared the agency rating of Athene to its market-adjusted implied rating.



FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

77.     The reported range above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

78.     NISA found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

79.     Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater

creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings correspond to insurers' likelihood of default.

80.     For instance, Athene maintains an A1 rating issued by Moody's, in contrast to New York Life's Moody's-issued AAA. Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to Athene's obligations to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. It can be expected that if extended to a 30-year time horizon, this differential would grow exponentially.

### 2.     *Athene relies on unreliable private letter ratings.*

81.     Athene depends on private letter ratings ("PLRs") from smaller private credit rating agencies. These private rating agencies apply less stringent standards for ratings than are applied to public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are also significant discrepancies among securities ratings provided by private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. In fact, PLRs issued by these small, private ratings agencies averaged 2.4 notches higher than ratings provided by the SVO for the same security. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

82.     In 2019, the Wall Street Journal ("WSJ") identified examples of these discrepancies among structured security ratings, including CLOs. The WSJ found that smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. As a result, a bond that would be classified as "junk" by major ratings

agencies could be classified as "very safe," and even be assigned an AAA rating by the smaller, private ratings agencies. This resulted in the classification of a bond as "junk" by major rating agencies while the smaller private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. PLRs that carry a higher credit rating than their SVO designation, for example, result in lower RBC charges, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

83.     Both KBRA and DBRS have been the subject of investigation by the SEC regarding their inaccurate rating practices, which resulted in millions of dollars in fines. Through one settlement, KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

## IV.   GE's History of Underfunding the Plan

84.     GE has a long history of underfunding the Plan preceding the PRT transaction with Athene. At the end of 2008, GE had a pension deficit of $7 billion. By 2011, GE closed its pension to new employees to ease its mounting pension deficit. Nevertheless, by the end of 2016, the deficit ballooned. GE had the largest pension deficit among companies listed on the S&P 500 at over $31 billion, as shown in the following chart.



85.      Its pension deficit was massive. GE's deficit was $11 billion higher than that of the next closest S&P 500 company when over 600,000 current and former employees relied on GE for their pension. Also in 2016, GE's in-house pension fund management division (GE Asset Management, "GEAM") was sold to State Street Global Advisors ("SSgA"). This after-tax gain of $260 million enabled GE to pay some of its pension obligations.

86.      In 2017, GE slashed its dividends for the second time since the Great Depression. Due to its financial troubles, GE borrowed $6 billion in 2018 to cover mandatory pension payments through 2020. But, by year-end 2018, the Plan was still underfunded by $22.4 billion, equating to a funding ratio of 75%. This percentage was well below the average funding ratio of 86% among S&P 500 companies.

87.      In light of the history of GE underfunding the Plan, in October 2019, GE froze the Plan entirely. This was part of an effort by Defendant Culp to "urgently repair GE's balance sheet, which (was) saddled with too much debt because of the company's shrinking profits, lofty pension shortfall and poorly-timed deals."

88.     GE then offered a lump sum distribution to approximately 100,000 Plan participants that failed to provide retirees with the full value of their pensions, just as was done through the PRT transaction with Athene. For instance, in the lump sum distribution, GE did not consider an early retirement subsidy for retirees, which excluded five years of their pension benefits. GE also used interest rates to minimize the value of the lump sum payment it offered.

## V.     GE's Longstanding Relationship with Apollo and Athene

89.     GE and Apollo have developed a decades-long business relationship that has financially benefitted both GE and Apollo, and in turn Athene. On September 14, 2006, GE announced the sale of its silicone supplier subsidiary, GE Advanced Materials, to Apollo for approximately $3.8 billion. Apollo rebranded the company and reduced wages of union workers by up to 40 percent. Apollo saw handsome returns at the expense of workers' livelihoods.

90.     GE and Apollo's relationship continued through GE Capital, the former financial services division of GE. In 2010, GE Capital underwrote $500 million to support a joint venture company to be created by Apollo along with two other firms. Then, in 2015, following GE's announcement that it would exit the commercial finance business, GE Capital and UAE-based Mubadala sold a $3.6 billion loan portfolio to Apollo subsidiary MidCap Financial. Finally, in 2018, funds managed by Apollo acquired a $1 billion portfolio from GE Capital's Energy Financial Services unit. In a press release, Apollo stated that "the parties will seek to form an ongoing relationship with respect to select future new energy infrastructure investments." By this point, GE and Apollo had laid the foundation for a long-lasting relationship that spread far beyond energy infrastructure to bring significant financial benefit to both companies.

91.     While Athene had already been involved in the GE-Apollo transactions previously mentioned due to its status as Apollo's insurance affiliate, just a year prior to the PRT transaction

at hand, Athene became a direct party to the relationship when Apollo and Athene purchased GE

Capital's aviation lending business. GE Capital sold $3.6 billion of its financing receivables to

Apollo and Athene, with Apollo acquiring the lending platform and Athene acquiring the loan

portfolio.

92.     The success of the Plan has also long been tied to the success of Apollo. GE has

reported Plan investments in Apollo-managed funds every year since 2009 and has paid Apollo

millions of dollars in direct and indirect compensation from the Plan. In 2020, the year in which

the PRT transaction at issue was completed, GE reported $1,211,071 in direct investment

management fees paid to five Apollo funds.

**VI.    The PRT transaction with Athene is the most recent business dealing between GE and Athene.**

93.     On December 15, 2020, GE and Athene announced the signing of a group annuity

contract ("GAC") with Athene under which Athene assumed $1.7 billion of GE's pension

obligations. The transaction transferred the pension benefits for approximately 70,000

participants to Athene. GE's purchase of the GAC was funded directly and exclusively from Plan

assets.

94.     As a result of the PRT transaction with Athene, GE no longer guarantees the

pension benefits for those retirees affected by the transaction. Athene is now solely responsible

for paying those pension benefits. Those retirees covered by the PRT transaction have had their

status as Plan participants terminated, and thus, are no longer subject to ERISA's protections for

employee benefits, including the backstop provided by the PBGC.

95.     Even though GE retirees had no ability to choose their annuity provider, Plan

assets transferred to Athene in connection with the PRT transaction cannot be withdrawn by

retirees. Athene also cannot transfer its pension obligations to another provider because it

irrevocably guarantees the monthly payments. Accordingly, a retiree with a lower risk appetite does not have the option to transfer her pension benefits to a safer, less risky alternative.

**VII. Defendants acted in their own self-interest by transferring GE's pension obligations to Athene through the PRT transaction.**

96.     Defendants violated their strict fiduciary duties by selecting and then causing the offloading of billions of dollars of Plan participants' retirement assets to Athene in a failure to select the safest annuity provider available. Relative to traditional annuity providers, Athene is a far riskier annuity provider.

97.     Numerous factors contribute to this risk, including Athene's lack of a sufficient track record guaranteeing pension liabilities, its strategy to invest in riskier assets, and its use of reinsurance with offshore affiliates. Despite clear evidence that Athene was substantially riskier than traditional annuity providers, Defendants placed GE retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated. No prudent and loyal fiduciary under the circumstances would have transferred retirees' pension benefits to Athene in a market with stable and established annuity providers.

98.     In the PRT industry, it is customary for plan fiduciaries to solicit competitive bids from insurers to ensure that the transfer is solely in the interest of plan participants and their beneficiaries. In light of the extensive information available to Defendants regarding the creditworthiness of Athene and its other deficiencies relative to traditional annuity providers, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Without conducting an independent and objective evaluation of available annuity providers, Defendants could not determine whether the use of

Athene as the Plan's annuity provider was prudent or in the best interest of the Plans' participants.

99.     Defendants' decision to choose or cause Athene to be retained as the annuity provider in the PRT transaction immediately harmed, and will continue to harm, participants and beneficiaries over an extended period through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life. Investors in the market demand a risk premium in exchange for exposure to higher risk. Plan participants and beneficiaries receive no additional compensation for taking on the additional risk associated with the transfer of their pension benefits to Athene.

100.    Interpretive Bulletin 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, GE received an economic benefit from choosing Athene in the form of reduced premium payments relative to what it would have paid to an established and reputable insurance provider such as New York Life.

101.    The premiums paid from the Plan to Athene would be reflected in the GAC between GE and Athene. However, Athene has refused to provide Plaintiffs a copy of the agreement. This is despite Athene representing to annuitants that they can receive the GAC upon request.

102.    Even if Athene's pricing was not more favorable to GE than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity provider if a safer annuity provider was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity.

103.    As the number of PRT transactions has dramatically increased due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the important role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown in Figure 1 below.



104.    Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. Among partial buyouts completed in 2022, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

105.    GE financially benefitted from the PRT transaction in other ways. GE will profit by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits. For approximately 70,000 participants, GE has saved more than $6 million annually since 2021.[4] Using the IRS life expectancy of 18.8 years for an average 70-year-old

---

[4] Pension Benefit Guaranty Corporation, Current and Historical Information, https://www.pbgc.gov/prac/prem/premium-rates (for 2023, per participant flat rate premium of $96).

retiree, GE will recognize a financial benefit of over $113 million from the transaction over the lives of approximately 70,000 retirees.

**VIII.  The PRT transaction diminished the value of GE retirees' pension benefits.**

106.    The PRT transaction to Athene immediately diminished the present value of Plaintiffs' and other GE retirees' pension benefits. The market for annuities sets the value for the same or similar future stream of payments issued by different annuity providers. If an annuitant receives the same payments, but from an issuer of lower creditworthiness, it is a loss for the annuitant. This is because the market will assign a lower price to an annuity issued by a riskier annuity provider to cover a similar stream of future payments to compensate the annuitant for the additional risk. The price or present value of the future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate the annuitant for assuming additional risk, the lower the present value of the annuity.

107.    Accordingly, GE retirees' pension benefits transferred to Athene are worth far less than they would be worth if issued by a traditional insurer of high credit quality. Because of these providers' high credit quality, they ensure a greater likelihood for retirees to receive their full pension. If the Athene annuity were purchased on the open market, any rational annuitant, if offered an identical annuity at the same price from these alternative issuers, would choose one from them, rather than the one from Athene—or, equivalently, would insist on paying a lower price for the annuity bought from Athene because of its lesser value. The amount of this loss of value of the pensions of the GE retirees whose pensions have been transferred to Athene is real and substantial in dollar terms.

108.    For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. A

higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume. Thus, a rational investor—let alone a prudent and loyal fiduciary—if offered an identical annuity from a traditional insurer, would not select Athene.

109.     After the PRT transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because of the transaction, Plaintiffs are no longer members of the Plan and their retirement benefits are not backed by the Plan, GE, or the PBGC. Their pension benefits were safer when they had these protections under ERISA. Based on Athene's current and future financial position, there is a substantial probability that it will fail to make good on its obligation to pay retirees' pension benefits.

110.     The PRT transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs and other GE retirees will not receive the retirement benefits that they have earned and which they are owed. The selection of Athene injured Plaintiffs the moment the transaction was executed because, at that moment, the present value of Plaintiffs' promised benefits was substantially and quantifiably diminished.

## CLASS ACTION ALLEGATIONS

111.     Plaintiffs seek class action certification on behalf of all participants in the GE Pension Plan (n/k/a the GE Aerospace Pension Plan) and their beneficiaries since December 15, 2020, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

112.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The proposed class includes approximately 70,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transaction and, if so, the appropriate remedy for any violation.

c.      Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plan and were subjected to Defendants' conduct in transferring GE's benefit payments to the Athene entities.

d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.     The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.     Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

113.     Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp*., No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);

Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess

Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL

ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec.

15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*,

REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*,

BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breach of Fiduciary Duties

114.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

115.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the

Plan and transactions at issue.

116.    As such, Defendants were required to discharge their duties with respect to the

Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's

participants and beneficiaries and defraying reasonable expenses of administering the Plan, and

"with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of

an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

117.    Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal

standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity

provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other

requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive

purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the

safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

118.    Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving GE money and enhancing corporate profits. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because Defendants' goal and motivation was to save GE money, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

119.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings realized by Defendants by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

120.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

### Knowing Participation in a Fiduciary Breach

121.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

122.    An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring an action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. 29 U.S.C. § 1132(a)(9). Section § 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduicaries who knowingly participate in a fiduciary breach under § 1104.

123.    If any of the Defendants did not act as fiduciaries with respect to the selection of Athene, then in the alternative to Count I, such defendants are liable under § 1132(a)(9) for knowing participation in the breach of the fiduciaries who selected Athene. Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's conduct a breach of fiduciary duties. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was not objective or sufficiently thorough. They also knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for GE, and then knowingly accepted that benefit.

## COUNT III

### Prohibited Transactions

124.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

125.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

126.     Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

127.     Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

128.     Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in transactions resulting in a direct or indirect sale or exchange of property between the Plan and Athene; furnishing of services between the Plan and Athene; or transfers of Plan assets to or for the use by or benefit of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

129.     The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

130.     By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase GE's corporate profits, Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party (GE) whose interest in using a riskier, lower-cost annuity provider was adverse to the interests of the Plans' participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

131.     Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by GE by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

132.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

133.     Even if Defendants did not act as a fiduciary over the selection of Athene in the PRT transaction, they are still liable as nonfiduciary parties-in-interest, who knowingly participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Defendants had actual or constructive knowledge that the Plan's PRT transaction with Athene was unlawful, and thus, knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer billions of dollars of pension obligations to Athene.

## COUNT IV

### Failure to Monitor Fiduciaries

134.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

135.     Defendants had a fiduciary responsibility for administering and overseeing the Plan, which included monitoring any other fiduciaries appointed or hired to manage the Plan. For instance, the Board of Directors (including Mr. Culp) had the authority to contract with an insurance company to provide pension benefits and to appoint members to serve on the Pension Board and Committee, the Pension Board had the delegated authority to manage the operation of the Plan, and the Committee had the authority to appoint one or more investment managers to manage Plan assets.

136.     A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards. Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B), and Interpretive Bulletin 95-1.

137.     Had Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Defendants would have decided not to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

138.     Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated

Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

June 28, 2024

Respectfully submitted,

/s/ Andrew D. Schlichter
SCHLICHTER BOGARD LLP
Andrew D. Schlichter, Bar No. 4403267
Jerome J. Schlichter*
Sean E. Soyars*
Kurt C. Struckhoff*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Phone: (314) 621-6115, Fax: (314) 621-5934
aschlichter@uselaws.com
jschlichter@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*Pro Hac Vice application forthcoming

Attorneys for Plaintiffs