# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE BUENO, DARLENE HOLLINS, and DAVID BUENO, individually and as representatives on behalf of a class of similarly situated persons,<br><br>*Plaintiffs*,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, THE BOARD OF DIRECTORS OF GENERAL ELECTRIC COMPANY, H. LAWRENCE CULP, JR., THE GENERAL ELECTRIC COMPANY PENSION BOARD, THE COMMITTEE, FIDUCIARY COUNSELORS, INC., and JOHN DOES 1–5,<br><br>*Defendants*. | No. 1:24-cv-00822-GTS-DJS<br><br>**AMENDED COMPLAINT—CLASS ACTION**[1]<br><br>JURY TRIAL DEMANDED |

1.      Plaintiffs Julie Bueno, Darlene Hollins, and David Bueno, individually and as representatives of a class of similarly situated persons whose benefit payments were transferred from the GE Pension Plan (n/k/a the GE Aerospace Pension Plan, the "Plan"), bring this action against Defendants General Electric Company (operating as GE Aerospace, "GE"), the Board of Directors of General Electric Company, H. Lawrence Culp, Jr., the General Electric Company Pension Board, the Committee, and John Does 1–5 (collectively, the "GE Defendants"), and Fiduciary Counselors, Inc. ("Fiduciary Counselors") (collectively, "Defendants") for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

---

[1] This amended pleading is filed "with the opposing party's written consent." Fed. R. Civ. P. 15(a)(2). *See* ECF No. 55.

2.      ERISA imposes strict fiduciary standards of conduct on fiduciaries, which are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). Plan fiduciaries must act both prudently and loyally, "solely in the interest" of participants and beneficiaries of the plan. 29 U.S.C. § 1104(a)(1). They must make fiduciary decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests or those of a third party. *Bierwirth,* 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), *II Scott on Trusts* §170, at 1297–99 (1967), and Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1978)) (citation omitted).

3.      In exchange for providing years of service to GE and its affiliates, GE employees were eligible to participate in a GE-sponsored defined benefit pension plan that promised them a guaranteed monthly benefit payment during retirement. On December 15, 2020, GE announced that it was transferring over $1.7 billion of these pension obligations to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively "Athene"). Athene is a highly risky private equity-controlled insurance company with a complex and opaque structure. This transaction affected over 70,000 GE retirees and their beneficiaries who depended on GE to guarantee their pension benefits through retirement. As a result of this transaction, Plaintiffs and similarly situated participants and their beneficiaries are no longer covered by the Plan, and hence, no longer receive the protections that ERISA provides for employee retirement benefits. Although an employer's decision to transfer pension obligations to an insurance company is considered a business decision not subject to fiduciary standards, the choice of an insurer is a fiduciary decision subject to ERISA's strict standards of prudence and loyalty. To fulfill those standards, the fiduciary must take steps geared toward obtaining the "safest annuity available," thereby ensuring that the pensions remain secure. 29 CFR § 2509.95-1. In other

words, the fiduciary must take steps to it hire the provider that "best promotes participants' and beneficiaries' interests" in retirement security. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000). Hiring a materially riskier provider to save the employer money is an egregious violation of fiduciary standards. *Id.*

4.       Defendants did not select the safest annuity available or an annuity that would otherwise best promote the retirees' interests in ensuring the long-term security of their pension benefits. Instead, Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers. Annuities issued by Athene are structured to generate higher expected returns and profits for Athene and its affiliates by investing in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations. Retirees do not share in the potential upside of these high-risk strategies, but bear the downside risk that losses will impair Athene's ability to pay their GE pensions. Thus, Athene's high-risk practices creates substantial risk at a great cost to retirees. Because the market devalues annuities when accounting for such risk, it is likely that GE saved a substantial amount of money from selecting Athene instead of an annuity from a traditional life insurer. In transferring Plaintiffs' pension benefits to Athene, Defendants put the future retirement benefits owed to GE retirees and their beneficiaries at substantial risk of default. This risk was not compensated and devalued their pensions.

5.       To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transactions, the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, the monetary value of the

reduced market value of Athene's annuities relative to the value of an ERISA-compliant annuity, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.    **Subject-matter jurisdiction.** This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.    **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by an established, multi-billion-dollar corporation, and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio. As a result of Defendants' misconduct in selecting Athene instead of the annuity that would best promote the transferees' interests, Plaintiffs lost the opportunity to obtain an annuity product of adequate quality and were forced to accept an inferior product. Plaintiffs remain subject to an increased and substantial risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher uncompensated risk, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.    **Venue.** This District is the proper venue for this action under 29 U.S.C.
§ 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, *inter alia*, at least one
Defendant resides or may be found.

THE PLAN

9.    On November 9, 2021, General Electric Company announced a strategic plan to
operate as three separate publicly traded companies from its three lines of business: (1)
aerospace; (2) energy; and (3) healthcare. Through two separation agreements, the company spun
off its energy and healthcare businesses to form GE Vernova (NYSE: GEV) on January 3, 2023,
and GE Healthcare (NYSE: GEHC) on April 2, 2024. The aerospace business remained with
General Electric Company and now operates as GE Aerospace.

10.    In preparation for the separation of the three businesses, the Plan was split into
three separate plans effective January 1, 2023: (1) GE Aerospace Pension Plan (the new name of
the Plan); (2) the GE Healthcare Pension Plan; and (3) the GE Energy Pension Plan. As of
December 31, 2022, and for years prior, the plan at issue was known as the "GE Pension Plan."

11.    The Plan is a defined benefit, employee benefit pension plan under 29 U.S.C.
§ 1002(2)(A) and § 1002(35) and governed by ERISA. Until January 1, 2023, the Plan covered
eligible employees of GE and participating affiliated companies.

12.    As of 2020, before the buy-out transaction at issue, the Plan covered 289,881 total
participants and held nearly $59 billion in net assets available for Plan benefits.

PARTIES

**I.    Plaintiffs**

13.    Plaintiff Julie Bueno resides in Canal Fulton, Ohio. Ms. Bueno was employed at
GE from approximately 1978 until 1989, at which time she held the position of Accounting

Clerk, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Bueno is currently receiving her pension payments from Athene.

14.     Plaintiff Darlene Hollins resides in Sacramento, California, and Ms. Hollins was employed by GE as a courier before retiring in 2005 and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Hollins is currently receiving her pension payments from Athene.

15.     Plaintiff David Bueno resides in Canal Fulton, Ohio, and is a current participant in the Plan under 29 U.S.C. § 1002(7). Mr. Bueno is the beneficiary of Ms. Bueno's pension benefits from Athene. He was employed at GE from 1986 through 2016.

## II.    Defendants

16.     General Electric Company (NYSE: GE) (operating as GE Aerospace) is a publicly traded company that supplies aircraft engines. GE is headquartered in Evendale, Ohio, and incorporated in Schenectady, New York. At the time of the transaction at issue, and prior to the separation of GE's lines of business, GE was headquartered in Boston, Massachusetts. GE's current market capitalization is roughly $189 billion. As of December 31, 2020, GE employed approximately 174,000 employees with operations in more than 170 countries. It recorded a profit of $7.3 billion in 2020.

17.     GE is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1002(16)(A). In December 2020, GE entered into an agreement with Athene under which GE agreed to purchase a group annuity contract to transfer defined benefit pension obligations to Athene. As alleged herein, GE exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary

responsibility in the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.     The Board of Directors of General Electric Company (the "Board of Directors") has the authority to contract with an insurance company or companies to provide the benefits payable under the Plan, establish a committee appointed to serve at the pleasure of the Board, and appoint members to the General Electric Company Pension Board and the Committee, among other duties. As alleged herein, the Board of Directors exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     H. Lawrence Culp, Jr. is the acting Chief Executive Officer of GE and held the same position at the time of the transaction at issue. Mr. Culp was the Chairman of the Board of Directors at the time that the transaction occurred. As alleged herein, Mr. Culp exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     The General Electric Company Pension Board (the "Pension Board") consists of four or more individuals appointed annually by the Board of Directors to serve at the pleasure of the Board of Directors. The Pension Board has the authority to control and manage the operation and administration of the Plan. Plaintiffs are currently unaware of the identities of the individual members of the Pension Board. As alleged herein, the Pension Board exercised discretionary

authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.     The Committee has the authority to appoint one or more investment managers with the authority to manage and control the assets of the Plan. The Committee consists of one or more members who are appointed by the Board of Directors to serve at the pleasure of the Board of Directors. Plaintiffs are currently unaware of the identities of the individual members of the Committee or the formal name of the Committee. As alleged herein, the Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.     Fiduciary Counselors, Inc. is a privately held investment consulting firm that holds itself out as an "independent" fiduciary for pension fund assets. Since 2003, Fiduciary Counselors has been wholly owned by its senior executives and former employees. Fiduciary Counselors is headquartered in Washington, D.C. Fiduciary Counselors was hired by the GE Defendants to act as the "independent fiduciary" over the transaction at issue here. As alleged herein, Fiduciary Counselors exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, rendered investment advice for a fee, or had discretionary authority or discretionary responsibility in the administration of the Plan, and is a fiduciary under 29 U.S.C. § 1002(21)(A).

23.     John Does 1–5 are unknown members of the Pension Board, members of the

Committee, or others who engaged in conduct triggering "fiduciary" status with respect to the

Plan or transaction at issue under 29 U.S.C. § 1002(21)(A).

### ERISA'S FIDUCIARY STANDARDS

24.     ERISA's primary purpose is to protect the retirement security of plan participants

and their beneficiaries. The statute achieves its protective purposes by imposing on plan

fiduciaries strict standards of conduct derived from the common law of trusts, most notably a

duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a)(1). The statute states, in relevant

part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then
> > prevailing that a prudent man acting in a like capacity and familiar with such
> > matters would use in the conduct of an enterprise of like character and with like
> > aims.

25.     The Department of Labor has issued regulatory guidance, known as Interpretive

Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as

it relates to a fiduciary's selection of an annuity provider in connection with a transfer of pension

obligations to an insurer. 29 CFR § 2509.95-1. To fulfill the duties to act solely in the interest of

participants and for the exclusive purpose of providing benefits, fiduciaries generally must take

steps calculated to obtain "the safest annuity available," among other requirements. *Id.* Fulfilling

the duty of prudence requires an objective, thorough, and analytical search for an annuity

provider. *Id.* Precedential authority adopts a materially similar standard requiring a thorough investigation designed to obtain the annuity that "best promotes participants' and beneficiaries' interests" in retirement security, *Bussian*, 223 F.3d at 302, which in practice will invariably be the safest annuity.

26.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered per se violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### I.    Pension Risk Transfers ("PRT")

27.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's predominant retirement system when ERISA was enacted in 1974.

28.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically a monthly payment, after retirement. Generally, employers are responsible for funding the pension plan to pay their benefit obligations to retirees. The amount of retirement benefits provided to employees is based on a formula that considers factors such as salary and years of service, among others.

29.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. Whereas participants bear that risk in a defined contribution plan, in a pension plan, the risk is borne by the employer (or plan sponsor). If plan assets are inadequate to satisfy liabilities for benefit payments, the employer has an obligation to make additional contributions to the plan until ERISA's funding requirements are met.

30.     In recent years, employers have increasingly sought to reduce their pension funding risk through pension-risk transfer or PRT transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

31.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a critically important fiduciary function because the selected provider becomes responsible for paying retirees and their beneficiaries for the rest of their lives.

32.     PRT transactions can take one of three forms: (1) total buyouts, in which the plan is terminated and all benefit obligations are transferred to an insurer through purchase of an annuity contract; (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the plan by an insurer. As discussed below, the PRT transaction at issue involved a partial buyout.

## II.    The Risks Associated with PRT Transactions

### A.    Lack of ERISA and PBGC Protections

33.    Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are protected by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

34.    Plan sponsors of ERISA-governed defined benefit plans are required to pay PBGC premiums, on which the PBGC relies if a plan sponsor becomes insolvent. PBGC premium obligations disappear when a PRT transaction occurs. Not only does this leave affected pensioners without PBGC protections, but it poses a funding risk to the PBGC, therefore threatening the level of protection offered to those participants still protected by the PBGC.

35.    SGAs offer less protection than the PBGC as they are not pre-funded. Rather, funding for SGAs comes from after-the-fact assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 in present value of annuity benefits, which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. For some annuitants, the situation is even worse. Plaintiff Hollins, a retiree living in California, would be subject to the so-called "California haircut"—the annuitant automatically loses 20%, as the maximum benefit is only 80% of the present value of the annuity, up to $250,000.[2]

---

[2] *See* Exhibit A to Bulletin 96-02; CA Ins. Code § 1076.17(b)(1), https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/bulletin-96-02.cfm#exhibita.

B.    **Risk of Insolvency and Executive Life**

36.    This risk of insolvency is not merely hypothetical. The 1991 collapse of Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially catastrophic consequences of high-risk insurance practices. Like the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

37.    In 1991, over 300,000 policyholders relied on Executive Life, which at the time held an A+ rating for financial soundness, for regular payments. But in 1990, a market downturn caused losses in Executive Life's bond portfolio and led to the insurer's 1991 seizure by the California insurance commissioner. Following the seizure, the California insurance commissioner sold Executive Life's investment portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for approximately half its value. Apollo is the parent company of Athene. Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.

38.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was Drexel's largest buyer of junk bonds. In contrast to most insurance companies that invested in safer assets, such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts to policyholders in the short-term, but its capacity was short-lived.

39.     By 1990, many of the Executive Life assets meant to fulfill payment obligations were in distress and trading for significantly less than their purchase price. When questioned on the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, including A+ from AM Best and AAA from Standard & Poor's.

40.     On April 11, 1991, California Insurance Commissioner John Garamendi seized Executive Life of California because its financial condition was a threat to policyholders. Until a week before Executive Life's seizure, it maintained a "contingent B-plus" rating from AM Best, meaning it was still considered "'very good'" despite a decline in position pending review. Less than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it only took weeks for parent company First Executive to file for bankruptcy. Executive Life and ratings agencies obscured the true riskiness of Executive Life's bond portfolio.

41.     Executive Life of New York was ultimately declared insolvent in 2012. In August 2013, the Guaranty Association Benefits Company ("GABC") was created to liquidate Executive Life of New York. The GABC continues to make payments to annuitants. However, a large number of annuitants experienced losses of 50% or more of their annuity payments. The GABC is expected to make reduced annuity payments until the last annuitant dies, which may not occur for decades.

42.     Two other large insurance companies, First Capital and Fidelity Bankers, also failed near the time of the failures of Executive Life and Executive Life of New York. A study as to the causes of these failures by the United States General Accounting Office ("GAO"), found a common thread: reckless practices of poorly controlled growth and investment in high-risk assets. The assets of the failed insurers grew at a rate six to ten times faster than the life

insurance industry's overall asset growth rate, in part due to sales of high-risk investment products. Losses of only 8.3% to 11.7% in these insurers' high-risk investments would be enough to eliminate their surplus and reserves. The insurers artificially inflated their surplus through a heavy reliance on reinsurance transactions. The Executive Life entities could have been declared insolvent as early as 1983—eight years earlier—if they had not masked their true financial condition through the excessive use of reinsurance and borrowed surplus. In short, poorly controlled growth, high-risk holdings coupled with thin surplus, and excessive reinsurance were driving factors in the failures of the Executive Life entities, First Capital, and Fidelity Bankers. Athene engages in the same high-risk practices which the government found were responsible for the collapse of these four insurers. *See infra*, Section III.

### C.    Response to Executive Life and Interpretive Bulletin 95-1

43.    In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1994). The amendment created a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," including "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

44.    In addition, the Department of Labor issued Interpretive Bulletin 95-1, which establishes a framework for ERISA compliance when choosing an annuity provider in a PRT transaction. 29 CFR § 2509.95-1. The Department of Labor has instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise."

45.     In order to determine the safest available annuity, Interpretive Bulletin 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through SGAs. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.

### D.    Private Equity Firms

46.     Traditional players in the PRT market include traditional life insurance and annuity providers, such as New York Life Insurance Company ("New York Life"). However, more recently, private equity firms have taken on a growing role in the PRT landscape through purchasing life insurers, creating offshore reinsurance affiliates, and serving as affiliated asset managers.

47.     The mission of private equity does not align with the interests of annuitants. While private equity firms began by purchasing insurance companies to finance their own operations, today they have moved beyond this business into the lines of private credit and insurance. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, but they can also generate enormous investment management fees for themselves. They focus on maximizing their immediate financial returns rather than ensuring receipt of the guaranteed pension benefits due to annuitants.

48.     The United States Department of the Treasury expressed concerns that the short and long-term objectives and strategy of alternative asset managers are misaligned with the long-

term commitment required to fulfill the interests of life insurance policyholders and annuitants. The Department of Labor also conducted a review of Interpretive Bulletin 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans (the "Council"). During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

49.    As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015. Lawmakers and industry experts are also concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns about the transfer of benefits that workers depend on for their retirement security to risky companies with proven histories of undermining pension and retirement programs.

50.    In the wake of the recent surge in life insurer liabilities and annuity sales spurred on by PRT transactions, some life insurers backed by private equity have reported extremely small surpluses relative to the risk profile of the assets held in their portfolios. The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the insurers' portfolios, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yield investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem more attractive.

### III.   Athene and its Financial Risks

51.    Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

52.    On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda-based affiliates owned by Athene's parent, Apollo.

53.    Athene and Apollo's interdependence is a cause for serious concern. A top ratings agency recently reported that *nearly 25%* of Apollo-owned companies have defaulted since 2022. The failures of these companies were exacerbated by an increase in interest rates. Private equity-owned companies, such as those owned by Apollo, carry increased debt and have lower credit ratings than non-private equity-owned companies, causing them to default at a higher rate. Between January 2022 and August 2024, private equity owned companies defaulted at a rate of 17%. This is double the default rate of non-private equity-owned companies. And since the end of 2020, two-thirds of all corporate defaults came from private equity-backed firms.

A.    **Athene's Complex Investment Structures and Ratings**

54.    Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which are headquartered in Hamilton, Bermuda. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. From 2018 to the present, these captive reinsurers have allowed Athene to capture market share using the tax-free status of their reinsurers to leverage lower pricing compared to traditional annuity providers.

55.    For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to Federal Reserve Board economists, insurance companies, like Athene, hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers. Athene has a higher-than-average investment in collateral loan obligations (CLOs), and as of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher ratio than most other U.S. life industry participants.

56.    Annuity and life insurance companies maintain surplus to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, is the only barrier between solvency and insolvency. To determine whether an insurer is capable of paying policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities. In the wake of the recent surge in life insurer

liabilities and annuity sales spurred by PRT transactions, some life insurers backed by private equity report extremely small surplus relative to the risk profile of the assets in their portfolios.

57.    Industry professionals recognize that there are four prevalent factors in the that must be assessed to evaluate the risk profile of an annuity provider: (1) adequate surplus relative to the carrier's size and risk profile; (2) the magnitude of the carrier's use of affiliated reinsurance relative to the surplus maintained by the carrier; (3) excessive growth rates of liabilities relative to surplus; and (4) the magnitude of higher-risk, less-liquid investments held in the portfolio relative to the surplus maintained by the carrier. The first two factors are recognized as driving factors leading to an insurer's insolvency.

58.    Surplus-to-liability ratio gauges an insurer's surplus adequacy (*i.e.,* its ability to pay claims from policyholders). It is calculated by dividing an insurer's surplus by its total liabilities.

59.    As of year-end 2023, Athene's surplus-to-liability ratio was only 1.44%. In contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of 12.24%. New York Life, in particular, is a relevant comparison because it has approximately the same amount of total liabilities as Athene. As of December 31, 2023, Athene had $199.1 billion in total liabilities, and New York Life had $206.6 billion. Other peer insurers have much larger surplus-to liability ratios than Athene: Teachers Insurance & Annuity Association ("TIAA") (13.83%), Nationwide Life Insurance Company ("Nationwide Life") (6.77%), and Pacific Life Insurance Company ("Pacific Life") (6.50%). The national average is over 7%.

60.    When considering the universe of insurance carriers as of December 31, 2023, Athene carries almost the thinnest surplus. Of the 695 active insurance carriers (*i.e.,* those active carriers reporting liabilities), Athene's surplus-to-liabilities ratio ranked 689th (or in the 99th

percentile). Just five carriers had a lower (or worse) ratio than Athene. When focusing on the largest insurance carriers with $100 billion in liabilities, Athene ranked 21 of 22 (or in the 95th percentile). Again, just one carrier had a lower ratio than Athene. As shown, Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers, and, as such, annuitants whose pensions have been transferred to Athene assume a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

61.    Athene touts its ample surplus, but this is misleading. When Athene discusses its surplus, it is speaking of that of Athene Holding Ltd., the holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which, as discussed *supra*, is among the thinnest in the country.

62.    Athene's total liabilities have also increased by more than 250% from 2018–2023. However, the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. The growth rate of Athene's liabilities has significantly surpassed the national average growth rate in the insurance industry of 29.90%. In contrast, New York Life's liabilities grew at the national average rate (29.92%) over the past five years. Other peer insurers have a dramatically lower growth rate than Athene: TIAA (15%), Nationwide (25%), and Pacific Life (52%). A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider based on these factors alone.

63.    Athene also has a high concentration of risky assets relative to its surplus. Higher-risk assets broadly include the following categories: commercial mortgages, mezzanine real estate loans, residential or commercial mortgage-backed securities, derivatives, affiliated party instruments, and other loan-backed bonds. For 2022, Athene reported $21 billion in "other loan-

backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, far less than its $23.88 billion surplus.

64.    As of the end of year 2023, Athene's ratio of higher risk assets to reported surplus was an astonishing 2,519%, compared to New York Life, whose ratio of higher risk assets to reported surplus was 279%. Athene's riskier assets total approximately $72.4 billion, while New York Life's higher-risk assets total approximately $70.7 billion. But New York Life has maintained a significantly greater surplus than Athene to withstand a write-down of these assets. Even a minor write-down of Athene's higher-risk assets increases the likelihood of an adverse regulatory event.

65.    Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. During the first six months of 2024, Athene increased its level of funding agreement-backed notes to 38%, up from 11% in 2023. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

66.    Athene's investment in affiliated assets also illustrates its higher risk because when an annuity provider is hit by a regulatory event, its affiliated investments suffer a more significant and rapid asset value write-down compared to unaffiliated investments. These affiliated investments are highly dependent on affiliated carriers (Athene Annuity Re Ltd.) for operating cash flow. From 2019 through 2023, Athene went from $4 billion to $19 billion in affiliated investments, while New York Life's affiliated investments increased from $17 billion to $23 billion. The percentage increase among these carriers illustrates the dramatic increase in

affiliated assets of Athene relative to New York Life. Over the five-year period, Athene's growth in affiliated assets was 368%, whereas New York Life's growth rate was 33%.

67.    Financial entities that combine U.S. life insurers, offshore captive reinsurers, and affiliated asset managers employ what is called a "Bermuda Triangle Strategy." The insurer (Athene) first builds a block of annuity business, often through a pension buyout, and then cedes its insurance liabilities to an affiliated offshore reinsurer located in Bermuda or another favorable jurisdiction (Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (Athene Asset Management) then originates, acquires, and manages private debt.

68.    Bermudian reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("SAP"). Bermuda does not follow the same detailed reporting standards. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda, Athene's affiliated reinsurers report only aggregate data without individual purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP.

69.    Although Bermuda received qualified jurisdiction reciprocal status from the NAIC in 2019, both U.S. regulators and the NAIC still consider insurers' reliance on offshore reinsurance as a current and substantial threat to policyholders. Just this year, in March 2024, the NAIC and regulators scrutinized the escalating trend of life insurance and annuity reserves being ceded offshore because such practices lack sufficient regulatory oversight and result in a substantial credit risk to the offshore reinsurance sector. The NAIC's Life Actuarial Task Force

emphasized the need for improved governance and transparency in these offshore transactions. In October 2024, the NAIC's Life Actuarial Task Force endorsed adopting asset adequacy testing over reinsurance transactions because these transactions lower the transparency of reserves held and the risks associated with the assets supporting the reserves. An industry participant noted during the NAIC meeting that, based on firsthand experience, when business moves offshore through reinsurance, the amount of assets backing policyholder obligations declined significantly.

70.    Moody's recently found that the movement of reinsurance offshore is a "credit negative" for the life insurance sector as a whole. A state insurance regulator who is also an NAIC actuary voiced concerns with offshore reinsurance because, compared to reserves regulated by U.S. SAP, offshore reserves can be substantially lower, can disappear entirely, or in the worst cases, can even be negative. According to the assistant commissioner of New Jersey's Office of Solvency Regulation, the recent increase in the use of offshore reinsurance is due in large part due to the fact that offshore reinsurance provides life insurers the ability to greatly reduce their reserves. When states periodically examine insurance companies, they do not even consider offshore reinsurers that are often under-reserved.

71.    While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Rather than reinsuring through a third-party reinsurer to diversify risk, Athene chooses to cede reinsurance to captive affiliates. As of year-end 2023, Athene reported over $155 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus. In contrast, New York Life maintains *zero* affiliated reinsurance.

72.     Beyond traditional reinsurance, Athene also engages in significant Modified

Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of

reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital

requirements associated with its asset risks to a reinsurer while retaining the assets. In 2022,

Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus.

For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9

billion in surplus. In contrast, New York Life, TIAA, Nationwide Life, and Pacific Life reported

*no* ModCo with offshore affiliates.

73.     Conducting ModCo transactions with Bermuda-based captive reinsurers, like

Athene Life Re, simply involves swapping insurance risks among commonly controlled

companies in order to avoid SAP requirements and artificially inflate Risk-Based Capital

("RBC") ratios. The RBC ratio measures the amount of capital or surplus an insurer must

maintain to pay policyholders (or annuitants) based on its level of risk. RBC ratios are inflated

because ModCo arrangements allow Athene to remove risky assets from its RBC ratio. And the

use of higher-risk assets enables Athene to value its liabilities at a lower rate. In offloading

capital requirements and asset risks to a captive reinsurer through an ultimately circular ModCo

transaction, Athene obscures the actual risks associated with the assets involved and is enabled to

maintain a lower level of surplus.

74.     The interdependence among Athene and its in-house reinsurer exposes each of

these entities to a heightened risk of failure. In the event that the assets in Athene's separate

account and then general account would be insufficient to cover its liabilities, Athene would be

forced to seek payment from its affiliated reinsurer for a portion of the annuity liabilities. This

close correlation is further evidence of Athene's weak financial condition relative to other

insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, or, in other words, itself. Furthermore, an inability to satisfy Athene's general account obligations would cause a downgrade in its credit rating, preventing it from raising funds in the credit markets.

75.     Because Athene houses most of its business in Bermuda, its holding company, Athene Holding, Ltd., primarily relies on dividends from its Bermudian operating companies. To further complicate this structure, Athene Holding, Ltd. is not a pure insurance holding company. It is part of Apollo, which has a large asset management business in addition to Athene's insurance operations.

76.     An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene due to the interdependence among captive affiliates. Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If even a fraction of the reinsurance transferred in 2021 were disallowed, as it would have been under NAIC statutory accounting principles, Athene would have faced a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene-affiliated insurance companies represent 40% of Apollo's value.

77.     Athene claims to have a "separate account" to pay the benefit payments owed to Plaintiffs and similarly situated GE retiree. But, on information and belief, this separate account is not truly "ring-fenced" or insulated from Athene's general liabilities. GACs issued by Athene in connection with similar PRT transactions state that while the separate accounts hold assets supporting the contracts, the assets in a given separate account may be used to support Athene's

payment obligations under other separate GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

78.     Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies given that affiliates determine the premium to be paid for the group annuity contracts or the amount of investment management fees charged by Apollo for managing the underlying assets and liabilities of the pensions.  Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

79.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. The provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company and, by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

80.     Athene's PRT business has also been subject to regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state. Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, Athene was ordered to pay a $45 million civil monetary penalty and meet other provisions.

**B.    Athene Shares Common Characteristics with Recently Failed Insurers.**

81.    Athene's practices resemble those of recently failed insurers in several critical respects. These practices have been recognized by industry professionals as having caused past failures and creating a substantial likelihood of default or insolvency.

*1.    Recently failed insurers engaged in similar higher-risk practices.*

82.    In 2024, four insurance companies failed: Columbian Life Insurance Company ("Columbian Life"), Columbian Mutual Life Insurance Company ("Columbian Mutual"), PHL Variable Insurance Company ("PHL Variable"), and 777 Reinsurance Ltd. ("777 Re"). Their failures demonstrate that the same practices that caused Executive Life's failure persist, including surplus inadequacy, risky financial practices, and inadequate risk management, among others.

83.    Columbian Life was part of a complex network of affiliated entities under parent company Columbian Mutual. Like Athene, Columbian Life and its affiliates held complicated and intertwined financial obligations to one another and engaged in multiple levels of offshore reinsurance. Ultimately, these circular and affiliated transactions, coupled with the company's declining financial health and inadequate reserves, led to its insolvency. Columbian Mutual's complex and opaque structure and involvement in affiliated transactions allowed the company to disguise its growing financial strain until regulatory intervention was both inevitable and necessary.

84.    Before its takeover by regulators, an independent actuarial analysis by the New York Department of Financial Services found Columbian Life's reserves to be significantly deficient. The company needed to increase its reserves by $104 million. Shortly thereafter, Columbian Life was placed into rehabilitation by the Illinois Department of Insurance. In August

2024, Columbian Mutual was placed into rehabilitation in New York as well, and their policyholders remain at substantial risk.

85.     PHL Variable faced financial challenges similar to those faced by Columbian Life, including, among other things, underperforming investments and a prolonged low-interest-rate environment. PHL Variable attempted to stabilize itself through reinsurance transactions, including with its captives. When these efforts proved futile, regulators took over PHL Variable and initiated rehabilitation proceedings to protect policyholders and stabilize the company. As discussed, Athene engages in the same risky practice of using an excessive amount of affiliated reinsurance relative to its surplus

86.     A common theme among collapsing insurers is the pursuit of higher returns through less liquid, more volatile assets and the use of opaque, affiliated reinsurance transactions. These strategies can generate short-term profits but expose insurers, like Athene, to substantial risk if market conditions change, leaving them unable to liquidate assets to meet policyholder demands.

87.     Much like other failed insurers, 777 Re, a Bermuda-based entity, engaged in complex and opaque financial arrangements with affiliates. Through these transactions, 777 Re's parent company (777 Partners) shifted liabilities off its balance sheet and misled regulators and investors into believing that it was financially sound. In reality, the affiliated reinsurance transactions just obscured 777 Partner's significant exposure and perilous financial status. Similar to Columbian Mutual, policyholders remain exposed.

88.     In addition to offshore reinsurance, 777 Re's portfolio contained high levels of risky and illiquid assets for the sake of higher returns. This strategy proved unsustainable, particularly when market conditions shifted, and contributed greatly to 777 Re's insolvency.

While these strategies of engaging in offshore, affiliated reinsurance transactions and holding high concentrations of risky assets can improve a company's financial position on paper and allow it to boast high returns, the risks introduced are significant, especially for those reinsurers that are undercapitalized and domiciled offshore.

### 2. *Athene's similarities to failed insurers*

89.     Athene's surplus-to-liability ratio is comparable to three recently failed insurers: Columbian Life, Columbian Mutual, and PHL Variable. As of year-end 2023, Athene had a surplus-to-liability ratio of 1.44%. Columbian Life and Columbian Mutual actually had *higher* surplus-to-liability ratios, 3.01% and 2.10%, respectively. As of year-end 2022, the last year that PHL Variable reported a positive surplus, its surplus-to-liability ratio was 1.03%. As previously indicated, all four ratios are dramatically below the national average of 7.49%.

90.     Additionally, similar to these failed insurance companies, Athene engages in affiliated reinsurance that far exceeds its surplus. As of December 31, 2023, Athene's use of affiliated reinsurance was *fifty-four* times the amount of its surplus. Columbian Life's use of affiliated reinsurance was *sixty* times the amount of its surplus, Columbian Mutual's was *twenty* times, and PHL Variable's was *ninety* times. In contrast, New York Life does not engage in *any* affiliated reinsurance.

### C.     Athene's Poor Credit Rating and Risky Offshore Practices

#### 1.     *Objective measures illustrate that Athene was not a reasonably safe annuity, let alone the safest available annuity.*

91.      NISA Investment Advisors, LLC ("NISA") is an asset management firm that specializes in liability-driven investments and de-risking strategies for defined benefit plans with over thirty years of experience and nearly $500 billion in assets under management. NISA performed a study that found Athene to be far riskier than multiple traditional annuity providers.

30

The report, dated October 13, 2022, evaluated the creditworthiness of nine PRT insurance providers, including Athene.[3] NISA performed its evaluation consistent with the framework outlined by Interpretive Bulletin 95-1. The report found that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk.

92.     To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%." As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last among the represented annuity providers. The NISA report demonstrates that Athene is much riskier than traditional annuity providers. NISA found the economic loss to beneficiaries to be 14% when Athene was chosen as the annuity provider.

---

[3] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

93. Other objective measures from the NISA report further illustrate that Athene was not the safest available annuity provider. The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. As seen in the chart, Athene had the highest reported spread of 214 basis points ("bps"). All else equal, an investor demands additional compensation for taking more credit risk to hold a bond that has a higher spread than a bond with a lower spread. But annuitants in a PRT transaction, whose payments are fixed, are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider, such as Athene.

94. Athene was also classified by NISA as a "Questionable Candidate" demanding "extenuating circumstances" to be considered as a provider for a PRT. The reported market spread, market price for risks assumed, and economic loss to annuitants are all significantly higher than the same measures for other annuity providers, such as New York Life. At least three

providers were found to be "Clear Candidates" to be selected as an annuity provider for a PRT.. Athene is thus far from the "safest available" annuity in the market.

95.    As stated in Interpretive Bulletin 95-1, "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." In light of this guidance, NISA separately compared the agency rating of Athene to its market-adjusted implied rating.



**FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness**

|  | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

96.     The reported range above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

97.     NISA found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate Athene as a potential provider.

98.     Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings correspond to insurers' likelihood of default.

99.     For instance, Athene maintains an A rating issued by Moody's, in contrast to New York Life's Moody's-issued AAA. Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to Athene's obligations to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. If extended to a 30-year time horizon, this differential would be expected to grow exponentially.

###### 2.     *Athene relies on unreliable private letter ratings.*

100.     Athene depends on private letter ratings ("PLRs") from smaller private credit rating agencies. These private rating agencies apply less stringent standards than public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are also significant discrepancies among securities ratings provided by

private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. In fact, PLRs issued by these small, private ratings agencies averaged 2.4 notches higher than ratings provided by the SVO for the same security. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

101.    In 2019, the Wall Street Journal ("WSJ") identified examples of these discrepancies among structured security ratings, including CLOs. The WSJ found that smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. As a result, a bond that would be classified as "junk" by major ratings agencies could be classified as "very safe," and even be assigned an AAA rating, by the smaller, private ratings agencies. This resulted in major rating agencies classifying a bond as "junk" by while the smaller private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. For example, if a security is given a higher credit rating from a private rating agency as compared to the SVO, an insurer could end up with lower RBC requirements than are actually warranted, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

102.    Both KBRA and DBRS have been the subject of investigation by the SEC regarding their inaccurate rating practices, which resulted in millions of dollars in fines. Through one settlement, KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with

SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

### 3.   Athene has been the subject of investigation by insurance regulators.

103.   Athene has been investigated by the State of New York for misconduct regarding its PRT business and was found to have violated New York law. Relative to other states, New York maintains some of the strictest standards for insurers. In January 2019, the New York Department of Financial Services investigated Athene Annuity and Life Company and Athene Holding Ltd., concluding that Athene Annuity and Life Company violated New York law by transacting insurance business related to its PRT business without a license from the State. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were jointly ordered to pay a $45 million civil penalty and satisfy other conditions. These other conditions included, among other things, prohibiting Athene Annuity and Life Company from soliciting, negotiating, selling, or servicing any PRT transactions, group annuity contracts, or related certificates in New York except through its subsidiary, Athene New York.

## IV.   GE's History of Underfunding the Plan

104.   GE has a long history of underfunding the Plan preceding the PRT transaction with Athene. At the end of 2008, GE had a pension deficit of $7 billion. By 2011, GE closed its pension to new employees to ease its mounting pension deficit. Nevertheless, by the end of 2016, the deficit ballooned. GE had the largest pension deficit among companies listed on the S&P 500 at over $31 billion, as shown in the following chart.



105.    Its pension deficit was massive. GE's deficit was $11 billion higher than that of the next closest S&P 500 company when over 600,000 current and former employees relied on GE for their pension. Also in 2016, GE's in-house pension fund management division (GE Asset Management, "GEAM") was sold to State Street Global Advisors ("SSgA"). This after-tax gain of $260 million enabled GE to pay some of its pension obligations.

106.    In 2017, GE slashed its dividends for the second time since the Great Depression. Due to its financial troubles, GE borrowed $6 billion in 2018 to cover mandatory pension payments through 2020. But, by year-end 2018, the Plan was still underfunded by $22.4 billion, equating to a funding ratio of 75%. This percentage was well below the average funding ratio of 86% among S&P 500 companies.

107.    In light of the history of GE underfunding the Plan, in October 2019, GE froze the Plan entirely. This was part of an effort by Defendant Culp to "urgently repair GE's balance sheet, which (was) saddled with too much debt because of the company's shrinking profits, lofty pension shortfall and poorly-timed deals."

108.    GE then offered a lump sum distribution to approximately 100,000 Plan participants which was designed to favor GE at the expense of participants by excluding an early retirement subsidy from the offer and using an interest rate that had the effect of maximizing the reduction in GE's pension liability by minimizing the amount of each lump sum payment to employees.

## V.    GE's Longstanding Relationship with Apollo and Athene

109.    GE and Apollo have developed a decades-long business relationship that has financially benefitted both GE and Apollo, and in turn Athene. On September 14, 2006, GE announced the sale of its silicone supplier subsidiary, GE Advanced Materials, to Apollo for approximately $3.8 billion. Apollo rebranded the company and reduced wages of union workers by up to 40 percent. Apollo saw handsome returns at the expense of workers' livelihoods.

110.    GE and Apollo's relationship continued through GE Capital, the former financial services division of GE. In 2010, GE Capital underwrote $500 million to support a joint venture company to be created by Apollo along with two other firms. Then, in 2015, following GE's announcement that it would exit the commercial finance business, GE Capital and UAE-based Mubadala sold a $3.6 billion loan portfolio to Apollo subsidiary MidCap Financial. Finally, in 2018, funds managed by Apollo acquired a $1 billion portfolio from GE Capital's Energy Financial Services unit. In a press release, Apollo stated that "the parties will seek to form an ongoing relationship with respect to select future new energy infrastructure investments." By this point, GE and Apollo had laid the foundation for a long-lasting relationship that spread far beyond energy infrastructure to bring significant financial benefit to both companies.

111.    While Athene had already been involved in the GE-Apollo transactions previously mentioned due to its status as Apollo's insurance affiliate, just a year prior to the PRT transaction

at hand, Athene became a direct party to the relationship when Apollo and Athene purchased GE Capital's aviation lending business. GE Capital sold $3.6 billion of its financing receivables to Apollo and Athene, with Apollo acquiring the lending platform and Athene acquiring the loan portfolio.

112.    The success of the Plan has also long been tied to the success of Apollo. GE has reported Plan investments in Apollo-managed funds every year since 2009 and has paid Apollo millions of dollars in direct and indirect compensation from the Plan. In 2020, the year in which the PRT transaction at issue was completed, GE reported $1,211,071 in direct investment management fees paid to five Apollo funds.

## VI.   The PRT transaction with Athene is the most recent business dealing between GE and Athene.

113.    On December 15, 2020, GE and Athene announced the signing of a group annuity contract ("GAC") with Athene under which Athene assumed $1.7 billion of GE's pension obligations. The transaction transferred the pension benefits for approximately 70,000 participants to Athene. GE's purchase of the GAC was funded directly and exclusively from Plan assets.

114.    On information and belief, GE hired Fiduciary Counselors as a purportedly "independent" fiduciary over the PRT. According to the Plan's 2020 and 2021 annual reports filed with the Department of Labor (Form 5500), GE caused the Plan to pay Fiduciary Counselors $166,235 in 2020 and $133,848 in 2021 for consulting services.

115.    As a result of the PRT transaction with Athene, GE no longer guarantees the pension benefits for those retirees affected by the transaction. Athene is now solely responsible for paying those pension benefits. As to the retirees covered by the PRT transaction, the Plan has

effectively been terminated, and thus, they are no longer subject to ERISA's protections for employee benefits, including the backstop provided by the PBGC.

116.     Even though GE retirees had no ability to choose their annuity provider, Plan assets transferred to Athene in connection with the PRT transaction cannot be withdrawn by retirees.. Thus, the individuals affected by the transaction are exposed to the substantial risk that Athene's high-risk practices will cause it to default on its obligations to retirees, and have no ability to transfer their pensions to a safer, less risky alternative.

## VII.  Defendants acted in their own self-interest by transferring GE's pension obligations to Athene through the PRT transaction.

117.     The prevailing circumstances demonstrate that Defendants violated their fiduciary responsibilities by selecting Athene as the Plan's annuity provider. Had Defendants conducted an impartial investigation of available annuity providers, they would have discovered that Athene did not best promote the interests of the affected retirees and was nowhere close to the safest available option to select as an annuity provider. There were numerous factors that would have led a loyal, prudent, and truly independent fiduciary to conclude that Athene should be rejected as a candidate, including Athene's complex investment structure and offshore practices, private equity relationships, inferior creditworthiness, and use of unreliable credit rating agencies, all of which show that Athene is far riskier than traditional annuity providers.

118.     An impartial and thorough investigation would have detected numerous factors contributing to this risk, including Athene's lack of a sufficient track record guaranteeing pension liabilities, its strategy to invest in riskier assets, and its use of reinsurance with offshore affiliates. Despite clear evidence that Athene was substantially riskier than traditional annuity providers, Defendants placed GE retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated. In a market with numerous

providers who are vastly better qualified, no prudent or loyal fiduciary under the circumstances would have transferred retirees' pension benefits to Athene Thus, it is evident that Defendants did not engage in an independent and thorough investigation of available providers before selecting and transferring pension benefits to Athene.

119.    It is a customary industry practice for fiduciaries selecting a PRT provider to solicit competitive bids or proposals from numerous insurers to identify the candidate that will best promote the participants' and beneficiaries' interest in the continued security of their pensions. In light of the extensive information available to Defendants that would have compelled a truly impartial and prudent fiduciary to reject Athene given its inferior creditworthiness and other deficiencies relative to traditional annuity providers, it is evident that Defendants either did not solicit proposals from other providers or made a predetermined decision to select Athene despite its glaring deficiencies relative to establish providers in the market. Without a truly independent and objective evaluation of a range of available annuity providers, Defendants could not reach a reasoned conclusion that using Athene as the Plan's annuity provider was prudent or in the best interest of the Plan's participants.

120.    Interpretive Bulletin 95-1 instructs fiduciaries that a desire to save costs can "*never* justify . . . purchasing an unsafe annuity." 29 CFR § 2509.95-1(d) (emphasis added). On information and belief, the choice of Athene conferred an economic benefit on GE in the form of reduced premium payments relative to the cost of a safe, established, and reputable insurance provider such as New York Life.

121.    The premiums paid from the Plan to Athene would be reflected in the GAC between GE and Athene. However, Athene has refused to provide Plaintiffs a copy of the

agreement. This is despite Athene representing to annuitants that they can receive the GAC upon request.

122.    Even in the improbable event that Athene's pricing was not more favorable to GE than that of traditional annuity providers, no prudent fiduciary would opt for a riskier annuity provider if a safer annuity provider was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity.

123.    It is apparent that Defendants' conflicts of interest infected the fiduciary decision to select Athene. As discussed, GE's pension liabilities and massive underfunding have long been a drag on corporate profits, as Defendant Culp has acknowledged. GE's willingness to implement cost-cutting measures to slash its pension liabilities, even when those measures come at the expense of retirees, is shown by the 2019 lump sum offer excluding an early retirement subsidy and using an interest rate that had the effect of minimizing payments to participants. Thus, the GE Defendants had a strong motivation to select the lowest-cost provider, thereby mitigating GE's underfunding woes, even when doing so jeopardized the security of retirees' pensions.

124.    Hiring a purportedly "independent" fiduciary did not remove the taint. Despite its self-proclaimed "independence," Fiduciary Counselors is a for-profit business. Thus, its revenue depends on repeat business from clients like GE. The market for retirement plan services is highly competitive, and employers like GE with billions of dollars under management have tremendous leverage over providers who wish to keep the business. As an experienced consultant, Fiduciary Counselors surely understood GE's well documented pension-related financial issues. It surely understood its client's motivation in offloading pension obligations was

to enhance profits by reducing pension liabilities. Thus, Fiduciary Counselors surely understood that selecting the lowest-cost candidate without regard to safety would advance its client's interests, while selecting the safest—but more expensive—provider would undermine GE's financial goals and harm Fiduciary Counselors' own financial interest in securing future business from GE. Given that Athene was a clearly inferior choice based on objective measures of relative safety, it is apparent that Fiduciary Counselors put the financial interests of GE and itself over those of the retirees to whom it owed fiduciary duties.

125.    As the number of PRT transactions has dramatically increased in recent years due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the important role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown in Figure 1 below.



126.    Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. Among partial buyouts completed in 2022, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

43

127.    GE financially benefitted from the PRT transaction in other ways. GE will profit by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits. For approximately 70,000 participants, GE has saved more than $6 million annually since 2021.[4] Using the IRS life expectancy of 18.8 years for an average 70-year-old retiree, GE will recognize a financial benefit of over $113 million from the transaction over the lives of approximately 70,000 retirees.

## VIII.   The PRT transaction substantially diminished the value of GE retirees' pension benefits and substantially interfered with Plaintiffs' payment rights.

128.    Defendants' decision to choose or cause Athene to be selected as the annuity provider in the PRT transaction immediately harmed, and will continue to harm, participants and beneficiaries over an extended period through uncompensated risk. The PRT transaction with Athene immediately diminished the present value of Plaintiffs' and other GE retirees' pension benefits. The market for annuities sets the value for the same or similar future stream of payments issued by different annuity providers. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life. Investors in the market demand a risk premium in exchange for exposure to higher risk. Plan participants and beneficiaries receive no additional compensation for taking on the additional risk associated with the transfer of their pension benefits to Athene. When an annuitant receives the same payments, but from an issuer of lower creditworthiness, it is a loss for the annuitant. This is because the market will assign a lower price to an annuity issued by a riskier annuity provider to cover a similar stream of future payments to compensate the annuitant for the additional risk. The price or present value of the future annuity payments is determined by the rate of return or discount

---

[4] Pension Benefit Guaranty Corporation, Current and Historical Information, https://www.pbgc.gov/prac/prem/premium-rates (for 2023, per participant flat rate premium of $96).

rate. The higher the discount rate to compensate the annuitant for assuming additional risk, the lower the present value of the annuity.

129.    Accordingly, GE retirees' pension benefits transferred to Athene are worth far less than they would be worth if issued by a traditional insurer of high credit quality. Because of these providers' high credit quality, they ensure a greater likelihood that retirees will receive their full pension. If the Athene annuity were purchased on the open market, any rational annuitant, if offered an identical annuity at the same price from these alternative issuers, would choose one from them, rather than the one from Athene—or, equivalently, would insist on paying a lower price for the annuity bought from Athene because of its lesser value. The amount of this loss of value of the pensions of the GE retirees whose pensions have been transferred to Athene is real and substantial in dollar terms.

130.    For instance, the Athene 10- and 20-year annuities have a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. A higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume. Thus, a rational investor—and a prudent and loyal fiduciary—if offered an identical annuity from a traditional insurer, would not select Athene.

131.    After the PRT transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because GE's obligation to pay Plaintiffs' pension benefits was offloaded to Athene, Plaintiffs are no longer members of the Plan and their retirement benefits are not backed by the Plan, GE, or the PBGC. Their pension benefits were safer when they had these protections under ERISA. Based on Athene's current and future financial position,

there is a substantial probability that it will fail to make good on its obligation to pay retirees' pension benefits.

132.    The PRT transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs and other GE retirees will not receive the retirement benefits that they have earned and which they are owed. The selection of Athene injured Plaintiffs the moment the transaction was executed because, at that moment, the present value of Plaintiffs' promised benefits was substantially and quantifiably diminished.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs seek class action certification on behalf of all participants in the GE Pension Plan (n/k/a the GE Aerospace Pension Plan) and their beneficiaries as of December 15, 2020, for whom the responsibility for plan-related benefit payments was transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

134.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The proposed class includes approximately 70,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transaction and, if so, the appropriate remedy for any violation.

c.    Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plan and were subjected to Defendants' conduct in transferring GE's benefit payments to the Athene entities.

46

d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this

matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

135.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breach of Fiduciary Duties by All Defendants Regarding Athene

136.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

137.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan and transactions at issue.

138.    As such, Defendants were required to discharge their duties with respect to the Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's participants and beneficiaries and defraying reasonable expenses of administering the Plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

139.    Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider. This is confirmed by case law adopting a materially similar standard and holding that the fiduciary must take steps to conduct a thorough and impartial investigation designed to identify and hire the provider that "best promotes participants' and beneficiaries' interests" in the security of their pensions, without regard to cost. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000).

140.    Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, nor was it the provider that would best promote the interests of the transferees. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving GE money and enhancing corporate profits. In so doing, Defendants breached their duty of loyalty by favoring corporate interests over the participants' interests in a secure retirement. Because Defendants' goal and motivation was to save GE money, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

141.    Fiduciary Counselors breached its fiduciary duties by failing to conduct a thorough investigation of alternatives and failing to adequately evaluate the many deficiencies it would have discovered if it had thoroughly evaluated Athene as a candidate. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, nor was it the provider that would best promote the interests of the transferees.

142.    Defendants' fiduciary breaches in selecting Athene resulted in harm to Plaintiffs and class members from an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

143.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings realized by Defendants by virtue of purchasing Athene annuities instead of an ERISA-compliant annuity,

and the posting of security to assure receipt by Plaintiffs and class members of their full

retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3),

1132(a)(9).

144.    Based on the facts alleged herein, each Defendant is also liable for the breaches of

its co-fiduciaries under 29 U.S.C. § 1105(a) because the alleged facts show that each Defendants

knowingly participated in the breach of the other Defendants, knowing that such acts were a

breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own

fiduciary duties, knew of the breach by the other Defendants, or failed to make any reasonable

effort under the circumstances to remedy the breach.

## COUNT II

### Non-Fiduciary Knowing Participation in ERISA Violations

145.    Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs.

146.    Under 29 U.S.C. § 1132(a)(3), a court may award appropriate equitable relief to

redress violations of ERISA. While certain ERISA provisions impose liability on fiduciaries

only, § 1132(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Tr. &*

*Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 246 (2000).

147.    Section § 1132(a)(9) allows a court to order appropriate relief to remedy a PRT

that violates ERISA, and also admits of no limit on the universe of possible defendants.

148.    If any of the Defendants did not act as fiduciaries with respect to the selection of

Athene, then in the alternative to Count I, such defendants are liable under §§ 1132(a)(3) and

1132(a)(9) for knowing participation in ERISA violations by the fiduciaries who selected Athene.

Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's

conduct a breach of fiduciary duties or prohibited transaction. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was not objective or sufficiently thorough. They also knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for GE, and then knowingly accepted that benefit. And they knew that the purchase of Athene annuities involved facts constituting transactions prohibited by § 1106.

**COUNT III**

**Prohibited Transactions**

149.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

150.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

151.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

152.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

153.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in transactions resulting in a direct or indirect sale or exchange of property between the Plan and Athene; furnishing of

services between the Plan and Athene; or transfers of Plan assets to or for the use by or benefit of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

154.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

155.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase GE's corporate profits, Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party (GE) whose interest in using a riskier, lower-cost annuity provider was adverse to the interests of the Plan's participants and their beneficiaries in obtaining the safest available annuity. 29 U.S.C. § 1106(b)(1)–(2).

156.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by GE by virtue of purchasing Athene annuities instead of an ERISA-compliant annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

157.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

158.     Even if Defendants did not act as a fiduciary over the selection of Athene in the PRT transaction, they are still liable as nonfiduciary parties-in-interest, who knowingly participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Defendants had actual or constructive knowledge that the Plan's PRT transaction with Athene was unlawful, and thus, knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer billions of dollars of pension obligations to Athene.

**COUNT IV**

**Failure to Monitor Fiduciaries**

159.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

160.     Defendants had a fiduciary responsibility for administering and overseeing the Plan, which included monitoring any other fiduciaries appointed or hired to manage the Plan, including Fiduciary Counselors. For instance, the Board of Directors (including Mr. Culp) had the authority to contract with an insurance company to provide pension benefits and to appoint members to serve on the Pension Board and Committee, the Pension Board had the delegated authority to manage the operation of the Plan, and the Committee had the authority to appoint one or more investment managers to manage Plan assets.

161.     A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards. Defendants breached their fiduciary monitoring duties by failing to ensure that the process of

selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B), and Interpretive Bulletin 95-1.

162.    Had Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest available annuity or Defendants would have decided that it was not possible to proceed with the transaction consistent with ERISA's fiduciary standards. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

### JURY TRIAL DEMANDED

163.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

### PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.


December 6, 2024                          Respectfully submitted,

                                          /s/ *Sean E. Soyars*
                                          SCHLICHTER BOGARD LLP
                                          Andrew D. Schlichter, Bar No. 4403267
                                          Jerome J. Schlichter*
                                          Sean E. Soyars*
                                          Kurt C. Struckhoff*
                                          100 South Fourth Street, Suite 1200
                                          St. Louis, Missouri 63102
                                          Phone: (314) 621-6115, Fax: (314) 621-5934
                                          aschlichter@uselaws.com
                                          jschlichter@uselaws.com
                                          ssoyars@uselaws.com
                                          kstruckhoff@uselaws.com

                                          *Admitted *Pro Hac Vice*

                                          *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Sean E. Soyars, hereby certify that on December 6, 2024, I caused a true and correct copy of the foregoing pleading to be filed and served on all counsel of record via CM/ECF.

                                          /s/ *Sean E. Soyars*
                                          SCHLICHTER BOGARD LLP