# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JULIE BUENO, DARLENE HOLLINS, and
DAVID BUENO, individually and as
representatives on behalf of a class of similarly
situated persons,

*Plaintiffs,*

v.

GENERAL ELECTRIC COMPANY, THE
BOARD OF DIRECTORS OF GENERAL
ELECTRIC COMPANY, H. LAWRENCE
CULP, JR., THE GENERAL ELECTRIC
COMPANY PENSION BOARD, THE
COMMITTEE, FIDUCIARY COUNSELORS
INC., and JOHN DOES 1-5,

*Defendants.*

Case No. 1:24-cv-822 (GTS/DJS)

# MEMORANDUM IN SUPPORT OF GE DEFENDANTS'
# MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 3

    A.    Defined-benefit plans and pension risk transfers.................................... 3

    B.    ERISA's rules for PRTs......................................................................... 4

    C.    GE's 2020 decision to transfer pension obligations to an insurer for individuals whose Plan benefit payment was less than $360/month ...... 5

    D.    Plaintiffs' claims and allegations.......................................................... 7

ARGUMENT ........................................................................................................ 8

I.    Plaintiffs lack standing because they have not alleged any injury in fact. ........ 8

    A.    The Supreme Court's decision in *Thole* forecloses Plaintiffs' standing............... 8

    B.    Plaintiffs cannot establish Article III standing by attempting to quantify the market value of an Athene annuity. .................................. 10

    C.    Plaintiffs do not allege a certainly impending risk of default by Athene. ........... 11

II.    Plaintiffs do not plead any viable claims against the GE Defendants with respect to the selection of Athene. ............................................................... 19

    A.    Plaintiffs' fiduciary-breach and prohibited-transaction claims (Counts I and III) against the GE Defendants fail because the GE Defendants did not make the fiduciary decision to select Athene. ............................. 20

    B.    Plaintiffs fail to allege the elements of derivative liability (Counts II and IV) against the GE Defendants.................................................... 22

    C.    Plaintiffs' derivative claims fail because Plaintiffs do not plead viable fiduciary-breach or prohibited-transaction claims with respect to the selection of Athene by FCI. ................................................................. 24

III.    Plaintiffs lack statutory standing to sue under 29 U.S.C. §§ 1132(a)(2) and (a)(3). ....... 24

IV.    Plaintiffs' claims against Lawrence Culp should all be dismissed. ................ 25

CONCLUSION..................................................................................................... 25

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................... 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................................. 6

*Beck v. PACE Int'l Union,*
    551 U.S. 96 (2007) ............................................................................................ 5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 2, 19

*Bilello v. JPMorgan Chase Ret. Plan,*
    592 F. Supp. 2d 654 (S.D.N.Y. 2009) ............................................................. 25

*Blatt v. Marshall & Lassman,*
    812 F.2d 810 (2d Cir. 1987) ............................................................................. 20

*Cappello v. Franciscan All., Inc.,*
    2019 WL 1382909 (N.D. Ind. Mar. 27, 2019) ................................................ 15

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship,*
    2023 WL 5971144 (S.D.N.Y. Sept. 14, 2023) .................................................. 5

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983) .......................................................................................... 12

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................... 2, 12, 14, 18

*Coan v. Kaufman,*
    457 F.3d 250 (2d Cir. 2006) ............................................................................. 25

*Coulter v. Morgan Stanley & Co. Inc.,*
    753 F.3d 361 (2d Cir. 2014) ....................................................................... 20, 24

*Cunningham v. Cornell Univ.,*
    2018 WL 1088019 (S.D.N.Y. Jan. 19, 2018) ................................................. 25

*David v. Alphin,*
    704 F.3d 327 (4th Cir. 2013) ..................................................................... 9, 13, 14

*DeLaurentis v. Job Shop Tech. Servs., Inc.,*
    912 F. Supp. 57 (E.D.N.Y. 1996) ................................................................... 23

*Duncan v. Muzyn*,
   885 F.3d 422 (6th Cir. 2018) ................................................................. 9

*Fifth Third Bancorp. v. Dudenhoeffer*,
   573 U.S. 409 (2014) ........................................................................... 19

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*,
   858 F. App'x 432 (2d Cir. 2021) ........................................................ 10

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999) .................................................................... 5, 9, 21

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022) ........................................................................... 20

*In re Fannie Mae 2008 ERISA Litig.*,
   2012 WL 5198463 (S.D.N.Y. Oct. 22, 2012) ...................................... 21

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
   2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ..................................... 11

*In re Smith Barney Transfer Agent Litig.*,
   765 F. Supp. 2d 391 (S.D.N.Y. 2011) .................................................. 5

*Indep. Ass'n of Publishers' Emps., Inc. v. Dow Jones & Co.*,
   671 F. Supp. 1365 (S.D.N.Y. 1987) .................................................... 21

*James v. Johnson & Johnson Consumer Cos., Inc.*,
   2011 WL 198026 (D.N.J. Jan. 20, 2011) ............................................. 11

*Kaplan v. Saint Peter's Healthcare Sys.*,
   2019 WL 1923606 (D.N.J. Apr. 30, 2019) ........................................... 15

*Leber v. Citigroup, Inc.*,
   2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ....................................... 23

*Lee v. Verizon Commc'ns, Inc.*,
   837 F.3d 523 (5th Cir. 2016) .................................................. 5, 9, 13, 21

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996) ...................................................................... 5, 21

*Lowen v. Tower Asset Mgmt., Inc.*,
   829 F.2d 1209 (2d Cir. 1987) ............................................................. 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................. 8

*N.Y. State Teamsters Council Health & Hosp. Fund v. Centrus Pharm. Sols.*,
   235 F. Supp. 2d 123 (N.D.N.Y. 2002) ................................................ 20

*Nechis v. Oxford Health Plans, Inc.*,
   421 F.3d 96 (2d Cir. 2005) ................................................................. 25

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ......................................................................... 12

*PBGC v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ............................................................... 19

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ......................................................................... 20

*Perez v. WPN Corp.*,
   2017 WL 2461452 (W.D. Pa. June 7, 2017) ........................................... 23

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) (Kavanaugh, J.) ............................... 11, 12

*Robainas v. Metro. Life Ins. Co.*,
   2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) ...................................... 14, 16

*Ross v. AXA Equitable Life Ins. Co.*,
   680 F. App'x 41 (2d Cir. 2017) ......................................................... 14

*Sanzone v. Mercy Health*,
   499 F. Supp. 3d 627 (E.D. Mo. 2020) ................................................ 14

*Sanzone v. Mercy Health*,
   954 F.3d 1031 (8th Cir. 2020) .......................................................... 14

*Scalia v. WPN Corp.*,
   417 F. Supp. 3d 658 (W.D. Pa. 2019) ................................................ 23

*Seljak v. Pervine Foods, LLC*,
   2023 WL 2354976 (S.D.N.Y. Mar. 3, 2023) .......................................... 6

*Stein v. Smith*,
   270 F. Supp. 2d 157 (D. Mass. 2003) ................................................ 23

*Sulyma v. Intel Corp. Inv. Pol'y Comm.*,
   909 F.3d 1069 (9th Cir. 2018),
   *aff'd*, 589 U.S. 178 (2020) ............................................................. 15

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020) ....................................... 1, 2, 3, 8, 9, 10, 11, 14, 16

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
   980 F.3d 879 (3d Cir. 2020) ............................................................. 11

*Tr. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) ............................................................. 22

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ............................................................................. 4

*Waxman v. Cliffs Nat. Res. Inc.*,
222 F. Supp. 3d 281 (S.D.N.Y. 2016) ................................................. 19

**Statutes**

29 U.S.C. § 1002 ...................................................................... 20, 21, 25

29 U.S.C. § 1104 .............................................................................. 7, 20

29 U.S.C. § 1105(a) ............................................................................. 22

29 U.S.C. § 1106 .............................................................................. 8, 20

29 U.S.C. § 1132 ........................................................................ 5, 24, 25

Iowa Code § 508.16 ............................................................................ 13

Iowa Code § 511.8 .............................................................................. 13

Md. Code Regs. 31.09.07.03 ................................................................ 6

N.Y. Ins. Law § 309 ........................................................................... 13

N.Y. Ins. Law § 1304 ...................................................................... 6, 13

N.Y. Ins. Law § 1403 ...................................................................... 6, 13

N.Y. Ins. Law § 1405 ......................................................................... 13

**Other Authorities**

29 C.F.R. § 2509.95-1(c)(6) ............................................................... 22

Am. Inv. Council, *2022 Public Pension Study*,
https://tinyurl.com/2vu428ab .............................................................. 15

Athene Holding Ltd., 2023 Annual Report (Form 10-K) (Feb. 27, 2024),
https://tinyurl.com/5n6pjbwc ................................................................ 6

Athene Press Release, *Athene Announces $4.9 Billion Pension Risk Transfer
Transaction with Lockheed Martin* (Aug. 3, 2021),
https://tinyurl.com/d5mtbsfk ................................................................. 6

Athene Press Release, *Athene Completes Significant Pension Risk Transfer
Transaction with JCPenney* (Apr. 1, 2021),
https://tinyurl.com/4e48w2wc ............................................................... 6

Ben Miller, *GE Pension Threats Show Peril of Transfers to Insurers, Spinoffs*,
Bloomberg Law (Apr. 12, 2024),
https://tinyurl/5yy2bpts ........................................................................................... 13

BenefitsLink.com, *Cross Reference: ERISA Sections and Their Corresponding
Sections in Title 29 of the United States Code*,
https://tinyurl.com/5t2pxpsn (last visited Feb. 17, 2025)............................................ 5

CNO Fin. Grp., Inc., 2023 Annual Report (Form 10-K) (Feb. 23, 2024),
https://tinyurl.com/57ac3x9h.................................................................................... 17

Dale Kintzel, *Social Security Retirement Benefits and Private Annuities: A
Comparative Analysis* (SSA, Off. of Ret. & Disability Policy Issue Paper No. 2017-
01, 2017),
https://tinyurl.com/3p7w9myt ..................................................................................... 6

ERISA Advisory Council, *Consultation Paper on Interpretive Bulletin 95-1* (July 2023),
https://tinyurl.com/mtyycza8................................................................................ 4, 12

FINRA, *Annuities, Overview*,
https://tinyurl.com/7777ne5n (last visited Feb. 19, 2025) ........................................... 6

GAO, *Defined Benefit Pension Plans* (Feb. 2012),
https://tinyurl.com/37wmvx5a ................................................................................... 15

GAO, GAO-15-74, *Private Pensions* (2015),
https://tinyurl.com/2acfcwaw .............................................................................. 3, 4, 5

GE Press Release, *GE Transfers $1.7 Billion in U.S. Pension Plan Obligations to
Athene* (Dec. 15, 2020),
https://tinyurl.com/mrh7e64m ..................................................................................... 5

James M. Poterba, *The History of Annuities in the United States* (Nat'l Bureau of
Econ. Rsch., Working Paper No. 6001, 1997),
https://tinyurl.com/2s4b2npu....................................................................................... 4

Letter from Jonathan Davidson, Assistant Sec'y for Legis. Affs., U.S. Dep't of the
Treas., to the Hon. Sherrod Brown, U.S. Sen. (June 29, 2022),
https://tinyurl.com/3ys8zz4k ....................................................................................... 6

Meg Fletcher, *ELIC's Collapse Forces Regulatory Changes*, Business Insurance (May
9, 1999),
https://tinyurl.com/bdzdrsh3 ....................................................................................... 4

Metlife, Inc., 2023 Annual Report (Form 10-K) (Feb. 15, 2024),
https://tinyurl.com/yx77huh4 ...................................................................................... 6

NAIC, *NAIC List of Reciprocal Jurisdictions* (2019),
https://tinyurl.com/5c2tu3z2 ..................................................................................... 17

NAIC, *State Insurance Regulators Work to Protect Consumers Who Buy Annuities* (Nov. 1, 2020), https://tinyurl.com/5a5hwmkr ................................................................. 18

Nat'l W. Life Grp., Inc., 2023 Annual Report (Form 10-K) (Feb. 29, 2024), https://tinyurl.com/yeyp8ybd ............................................................................... 17

Nathan Foley-Fisher et al., *Capturing the Illiquidity Premium,* Ret. Income J. (2020), https://tinyurl.com/2xckyuaj ................................................................................. 7

NISA, *PRT Credit Risk Monitor* (Jan. 17, 2025), https://tinyurl.com/3d984jf4.............................................................................. 10

PlanSponsor, *GE Transfers Some Pension Obligations to Insurer* (Dec. 21, 2020), https://tinyurl.com/mr3bmb7h ................................................................................ 5

Prudential Financial, Inc., 2023 Annual Report (Form 10-K) (Feb. 21, 2024), https://tinyurl.com/3wb6m75d ............................................................................... 6

Prudential Newsroom, *Prudential Financial, Inc. and Warburg Pincus Announce Launch of Prismic Life Re* (Sept. 7, 2023), https://tinyurl.com/9ave26an ................................................................................. 7

Remy Samuels, *GE Joins List of Companies Sued Over PRT Deal with Athene*, PlanSponsor (July 1, 2024), https://tinyurl.com/ywwwvbkh ............................................................................... 7

U.S. Dep't of the Treas., Fed. Ins. Off., *Annual Report on the Insurance Industry* (2020), https://tinyurl.com/455x834u ............................................................................... 15

## INTRODUCTION

This case must be dismissed because Plaintiffs—former participants in General Electric's ("GE") defined-benefit Pension Plan (the "Plan")—allege no cognizable injury in fact and therefore lack Article III standing. Plaintiffs challenge the transfer of pension obligations to an insurance company, but they have continued to receive the same monthly payments following the transfer as they received before. Because Plaintiffs have lost nothing and face no certainly impending risk of losing anything, they lack standing. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538, 542 (2020) (plaintiffs lacked standing where they "received all of their monthly pension benefits so far" and "will receive those same monthly payments for the rest of their lives"). And because the GE Defendants[1] hired an independent fiduciary to choose the insurance company for the transfer, Plaintiffs' fiduciary claims against them fail on the merits, too—they can't be held liable under ERISA's fiduciary provisions for a choice that wasn't theirs to make.

Plaintiffs' claims concern GE's decision to transfer certain pension obligations to an insurance company by using Plan assets to purchase a group annuity—a common and long-accepted practice known as a pension risk transfer. Under the Plan, Plaintiffs each received a fixed monthly payment of less than $360. In 2020, GE (operating today as GE Aerospace) decided to transfer its pension obligations for these individuals to an insurance company selected by Fiduciary Counselors Inc. ("FCI"), an independent fiduciary. FCI selected Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"). Following the transfer, Plaintiffs continue to receive the very same monthly payments they received under the Plan—except that their checks now come from Athene.

At the heart of Plaintiffs' Amended Complaint is an entirely speculative challenge to

---

[1] The GE Defendants named in the Amended Complaint include GE, the GE Board of Directors, H. Lawrence Culp, Jr., the GE Pension Board, and "the Committee."

Athene's financial condition. The Amended Complaint asserts, in speculative fashion, that Athene is "risky" and that the selection of Athene was a breach of fiduciary duty and a prohibited transaction under the Employee Retirement Income Security Act ("ERISA"). But *Thole* made clear that, to support standing, plaintiffs must show that the alleged statutory violation actually affected their pension benefits. In the context of defined benefit plans, that requires alleging that plan participants' fixed benefits have been reduced. *Thole* explained that a "defined-benefit plan is more in the nature of a contract," and "[t]he plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed." *Thole*, 590 U.S. at 542-543. Thus, even though the plaintiffs in *Thole* alleged millions in losses to plan assets due to fiduciary mismanagement, the Court held that they had suffered no injury in fact because they were receiving the same fixed benefits they were promised.

The same is true here. Plaintiffs were promised fixed monthly benefit payments under the Plan, and they continue to receive those monthly payments today. Plaintiffs' attempts to claim a heightened risk that they will not receive payments in the future fall well short of Article III's requirements. Such speculative "allegations of *possible* future injury are not sufficient" for standing; rather, any "threatened injury must be *certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (emphasis added) (brackets omitted).

Even if Plaintiffs had standing, they do not state plausible claims for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Plaintiffs' fiduciary claims against the GE Defendants fail for one simple reason: as Plaintiffs concede, FCI (an independent fiduciary unaffiliated with GE), and not the GE Defendants, made the fiduciary decision to select Athene. The GE Defendants therefore cannot be held liable for breaching ERISA's fiduciary duties or fiduciary prohibited-transaction provisions by selecting Athene. And Plaintiffs' co-fiduciary, non-fiduciary, and

failure-to-monitor claims against the GE Defendants (which require participation in the fiduciary violations with knowledge of the breach) are unsupported by any non-conclusory allegations of knowledge. Those claims also fail for lack of plausible underlying fiduciary-breach and prohibited transaction claims for the reasons explained by FCI. The Amended Complaint should be dismissed.

## BACKGROUND

### A.      Defined-benefit plans and pension risk transfers

When ERISA was enacted in 1974, defined-benefit plans were the norm. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole*, 590 U.S. at 540. Because participants are entitled only to the fixed monthly payments they are promised, there is no opportunity for higher-than-anticipated benefits due to investment outperformance—"the employer, not plan participants, receives any surplus left over after all of the benefits are paid." *Id.* at 543. This contrasts with defined-contribution (401(k)-type) plans, which dominate retirement plans today. Amended Complaint ("AC") ¶ 27. Defined-contribution plan participants have individual retirement accounts, "benefits are typically tied to the value of their accounts," and the benefits received are based on the performance of the plan's assets, which "can turn on the plan fiduciaries' particular investment decisions." *Thole*, 590 U.S. at 540.

Defined-benefit plans provide long-term uncertainty for employers, who bear the financial risk of paying benefits irrespective of inflation, interest rates, or the investment performance of plan assets. AC ¶ 29. Employers use a variety of measures to manage and limit this long-term risk. *See* GAO, GAO-15-74, *Private Pensions* 3-6 (2015), https://tinyurl.com/2acfcwaw. One option is a "pension risk transfer" ("PRT"), in which the plan sponsor transfers its pension obligations for some or all participants by using plan assets to purchase an annuity from an insurance company. *See id.* at 5; AC ¶¶ 30, 32. That purchase constitutes a distribution of benefits that satisfies the

employer's pension obligation, and the insurer assumes responsibility for making payments. *Private Pensions* 5. For former participants whose benefits are transferred, the *source* of their monthly benefits changes, but the *amount* of benefits does not. *Id.* at 4-5.

PRTs are a secure way to fulfill an employer's pension obligations because annuities are backed by a significant amount of assets, including assets transferred from the original plan, and are managed by regulated insurers who specialize in such products. Annuity contracts have been used widely for over a century to fund pension plan obligations.[2] They have become even safer after improvements in regulatory oversight prompted by watershed moments such as the collapse of Executive Life Insurance Company and the 2008 financial crisis.[3] Today, annuitants benefit from numerous structural protections including strict regulation under state insurance law, separation of assets used to fund annuity payments through a "separate account" structure, reinsurance, and backing by State Guarantee Associations ("SGAs") in the event of the insurer's insolvency. AC ¶ 33; ERISA Advisory Council, *Consultation Paper on Interpretive Bulletin 95-1*, at 1, 24, 29, 33-35 (July 2023) ("*Consultation Paper*"), https://tinyurl.com/mtyycza8.

### B. ERISA's rules for PRTs

ERISA governs most employer-sponsored retirement plans. Congress did not *require* employers to sponsor retirement plans. Instead, it crafted a system that would *encourage* employers to do so while ensuring that employees who are promised benefits receive them. *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Accordingly, decisions to establish, terminate, or amend plans are not governed by ERISA's fiduciary provisions—they are "settlor" decisions made in the employer's business capacity, and employers can make them for any reason, including

---

[2] *See generally* James M. Poterba, *The History of Annuities in the United States* (Nat'l Bureau of Econ. Rsch., Working Paper No. 6001, 1997), https://tinyurl.com/2s4b2npu.
[3] Meg Fletcher, *ELIC's Collapse Forces Regulatory Changes*, Business Insurance (May 9, 1999), https://tinyurl.com/bdzdrsh3.

management of corporate revenues and liabilities. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-444 (1999). Fiduciary duties attach "only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration." *Lockheed,* 517 U.S. at 890 (citation omitted).

Because PRTs involve the termination of a plan with respect to some or all participants, the decision to conduct a PRT is a settlor function not governed by ERISA's fiduciary obligations. *See* AC ¶ 3; *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 538 (5th Cir. 2016); *Private Pensions* 6. When implementing a PRT, however, ERISA's fiduciary standards govern the "selection of an appropriate annuity provider." *Beck v. PACE Int'l Union*, 551 U.S. 96, 102 (2007). ERISA further provides that if a PRT violates ERISA's fiduciary provisions, a civil action may be brought "by any individual who was a participant or beneficiary at the time of the alleged violation" to obtain "appropriate relief" to ensure annuitants receive the sums promised. 29 U.S.C. § 1132(a)(9).[4]

### C.    GE's 2020 decision to transfer pension obligations to an insurer for individuals whose Plan benefit payment was less than $360/month

In 2020, the relevant time here, GE employed 174,000 people and operated across more than 170 countries. AC ¶ 16. Among other benefits, GE provided a defined-benefit plan for eligible employees. *Id*. ¶ 11.[5] In December 2020, GE decided to conduct a partial PRT that applied only to individuals receiving pension payments of less than $360 per month.[6] The PRT applied to less

---

[4] *See* https://tinyurl.com/5t2pxpsn for an ERISA-U.S. Code cross-reference guide.

[5] After the PRT at issue here, GE separated into three public companies—GE Vernova (energy), GE Healthcare, and GE Aerospace—and divided the Plan into three plans. AC ¶¶ 9-10.

[6] PlanSponsor, *GE Transfers Some Pension Obligations to Insurer* (Dec. 21, 2020), https://tinyurl.com/mr3bmb7h; GE Press Release, *GE Transfers $1.7 Billion in U.S. Pension Plan Obligations to Athene* (Dec. 15, 2020), https://tinyurl.com/mrh7e64m. The court may take judicial notice of "news articles discussing the conduct raised in the complaint," *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011), and contemporaneous press releases, *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2023 WL 5971144, at *7 (S.D.N.Y. Sept. 14, 2023).

than 3% of GE's pension obligations and less than 25% of Plan participants. AC ¶¶ 3, 12.

Although ERISA does not require employers to retain an independent fiduciary to select an annuity provider for a PRT, many do, and GE did so here. AC ¶ 22. GE engaged FCI, a private investment advisor, to select an annuity provider. *Id.* ¶¶ 22, 114, 124. Ultimately, the Plan transacted with subsidiaries of Athene Holding Ltd., a financial services company that issues, reinsures, and acquires retirement savings products. *Id.* ¶¶ 3, 51.[7] Athene has provided PRTs to plans sponsored by some of the nation's largest employers.[8]

Athene is highly regulated under state insurance law,[9] which includes requirements to maintain certain capital reserve levels.[10] Like other insurers, including the insurance components of Metlife and Prudential, Athene is owned by a company that also has a private equity arm, here Apollo Global Management, Inc. (AC ¶¶ 51-52).[11] Athene's group annuity contracts are funded by assets in a separate account, supported by assets in Athene's general account, backed by SGAs, and protected by reinsurance from Bermuda-based providers. AC ¶¶ 54, 67, 77; *see infra* pp. 12-

---

[7]    Athene Holding Ltd., 2023 Annual Report (Form 10-K) (Feb. 27, 2024), https://tinyurl.com/5n6pjbwc ("Athene Annual Rep."). SEC filings are judicially noticeable. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[8] *E.g.*, Athene Press Release, *Athene Completes Significant Pension Risk Transfer Transaction with JCPenney* (Apr. 1, 2021), https://tinyurl.com/4e48w2wc; Athene Press Release, *Athene Announces $4.9 Billion Pension Risk Transfer Transaction with Lockheed Martin* (Aug. 3, 2021), https://tinyurl.com/d5mtbsfk.

[9] FINRA, *Annuities*, *Overview*, https://tinyurl.com/7777ne5n (last visited Feb. 19, 2025).

[10] *E.g.*, N.Y. Ins. Law §§ 1304, 1403; Md. Code Regs. 31.09.07.03; *see* Dale Kintzel, *Social Security Retirement Benefits and Private Annuities: A Comparative Analysis* 6 (SSA, Off. of Ret. & Disability Policy Issue Paper No. 2017-01, 2017), https://tinyurl.com/3p7w9myt.

[11]    Metlife, Inc., 2023 Annual Report (Form 10-K) 432, 434 (Feb. 15, 2024), https://tinyurl.com/yx77huh4; Prudential Financial, Inc., 2023 Annual Report (Form 10-K) 3, 6, 156, 340 (Feb. 21, 2024), https://tinyurl.com/3wb6m75d; Letter from Jonathan Davidson, Assistant Sec'y for Legis. Affs., U.S. Dep't of the Treas., to the Hon. Sherrod Brown, U.S. Sen. (June 29, 2022), https://tinyurl.com/3ys8zz4k. Agency letters are judicially noticeable. *See Seljak v. Pervine Foods, LLC*, 2023 WL 2354976, at *10 n.10 (S.D.N.Y. Mar. 3, 2023).

13. Bermuda reinsurers are used by other major insurers like AIG, MetLife, and Prudential,[12] many of whom Plaintiffs tout as preferred providers. AC ¶¶ 91, 92; Athene Annual Rep. 14, 19-20.

### D.    Plaintiffs' claims and allegations

This case is one of a series of carbon-copy complaints recently filed against sponsors of plans that implemented PRTs using Athene as their annuity provider.[13] Plaintiffs claim that GE engaged in a PRT for its own financial benefit and that FCI, as a "for-profit business" that is reliant on large companies like GE to retain it, was incentivized to choose the lower-cost annuity provider to save GE money. AC ¶¶ 117, 123-124, 127. Plaintiffs allege that Athene is an unduly risky annuity provider in comparison with other options based on its surplus-to-liability ratio, involvement with private equity, investment portfolio, use of Bermuda-based reinsurers, and "complex investment structures." *Id*. ¶¶ 54-76. They allege that the choice of Athene "increased the risk" that Plaintiffs "will not receive the retirement benefits" they were promised. *Id*. ¶ 132.

But Plaintiffs do not actually plead any allegations regarding FCI's process for choosing Athene. Instead, they merely assume that, based on the fact that FCI chose Athene, "it is evident that Defendants" either "did not solicit proposals from other providers or made a predetermined decision to select Athene" and "did not engage in an independent and thorough investigation of available providers before selecting and transferring pension benefits to Athene." *Id*. ¶¶ 118-119.

Based on these allegations, Plaintiffs assert four claims. Count I alleges that the selection of Athene violated ERISA's fiduciary duties of prudence and loyalty, 29 U.S.C. § 1104(a). AC ¶¶ 136-144. Count III alleges that the transaction constituted a prohibited transaction under

---

[12] Nathan Foley-Fisher et al., *Capturing the Illiquidity Premium* 6, Ret. Income J. (2020), https://tinyurl.com/2xckyuaj; Prudential Newsroom, *Prudential Financial, Inc. and Warburg Pincus Announce Launch of Prismic Life Re* (Sept. 7, 2023), https://tinyurl.com/9ave26an.

[13] Remy Samuels, *GE Joins List of Companies Sued Over PRT Deal with Athene*, PlanSponsor (July 1, 2024), https://tinyurl.com/ywwwvbkh.

ERISA, 29 U.S.C. § 1106(a)-(b). AC ¶¶ 149-158. Counts II and IV are derivative claims; they allege that any non-fiduciary defendant may be held liable for knowingly participating in a fiduciary breach (*id.* ¶¶ 145-148), and that any fiduciaries with monitoring responsibilities should be held liable for any breaches committed by fiduciaries who selected Athene (*id.* ¶¶ 159-162).

## ARGUMENT

### I.    Plaintiffs lack standing because they have not alleged any injury in fact.

As the Supreme Court has made clear, "[t]here is no ERISA exception to Article III." *Thole*, 590 U.S. at 547. Courts must apply the "ordinary Article III standing analysis," which at the pleading stage requires plaintiffs to "plausibly and clearly allege a concrete injury," *id.* at 544, 547—one that is "actual or imminent," rather than "conjectural" or "speculative." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 564 n.2 (1992). Plaintiffs fail to do so here.

### A.    The Supreme Court's decision in *Thole* forecloses Plaintiffs' standing.

Plaintiffs lack standing under *Thole* because they do not (and cannot) allege a curtailment (or imminent and certainly impending curtailment) of their fixed benefit payments. In *Thole*, two retirees sued fiduciaries of a defined-benefit plan, claiming that the fiduciaries imprudently and disloyally managed the plan, resulting in a loss of nearly $750 million in plan assets. 590 U.S. at 540-541. The plaintiffs sought restoration of losses, disgorgement of ill-gotten profits, and other equitable relief. *Id.* at 541, 544. The Supreme Court held that the plaintiffs lacked standing because, despite the defendants' alleged ERISA violations, the plaintiffs had "received all of their monthly pension benefits" and "will receive those same monthly payments for the rest of their lives." *Id.* at 541-542.

In *Thole*, it was of "decisive importance" that the plaintiffs were participants in "a defined-benefit plan, not a defined-contribution plan." 590 U.S. at 540. Participants in a defined-benefit plan "possess no equitable or property interest in the plan." *Id.* at 543. Instead, their only

entitlement is to their vested benefits, which are "not tied to the value of the plan." *Id*.; *see also Hughes Aircraft*, 525 U.S. at 439-441. Because their only legally protected interest was in receiving the benefits they were promised and *continued to receive*—"not a penny more" and "not a penny less"—they lacked standing to sue for the alleged plan mismanagement. *Thole*, 590 U.S. at 541.

*Thole* controls here. As in *Thole*, Plaintiffs participated in a defined-benefit plan. As Plaintiffs concede, what they were "promised" was "a guaranteed monthly benefit payment during retirement." AC ¶ 3. Accordingly, under *Thole*, their only legally protected interest under ERISA was in receiving the fixed monthly payments they were promised. Beyond that, Plaintiffs had no equitable or property interest in the Plan's assets. *See Duncan v. Muzyn*, 885 F.3d 422, 428 (6th Cir. 2018) ("a beneficiary under a defined-benefit plan has an interest only in his defined benefits—not in the entirety of the plan's assets"). Nor did the PRT suddenly bestow on them any new property interest: just as Plaintiffs had no legal entitlement to the assets of the Plan before the PRT, they have no property interest in Athene's investments and assets now. Rather, they are entitled only to the monthly benefits they acknowledge they *continue to receive*, AC ¶¶ 13-15, and "they are [still] legally entitled to receive the same monthly payments for the rest of their lives." *Thole*, 590 U.S. at 547.

That is why, under *Thole*, Plaintiffs cannot establish standing by alleging that they were "forced to accept an inferior product." AC ¶ 7. They were not promised a "product," much less a product of any particular comparative value. They were promised "a guaranteed monthly benefit payment during retirement," which is precisely what they continue to receive. *See Lee*, 837 F.3d at 544–45 (participant's interest limited to "fixed periodic payment"); *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) ("The Supreme Court has held that a participant in a defined benefit

pension plan has an interest in his fixed future payments only.").

Plaintiffs have thus sustained no injury in fact and "have no concrete stake in this dispute" and therefore lack standing to sue. *Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 434 (2d Cir. 2021) (quoting *Thole*, 590 U.S. at 547) (affirming dismissal).

**B.     Plaintiffs cannot establish Article III standing by attempting to quantify the market value of an Athene annuity.**

Plaintiffs try to circumvent *Thole* by alleging that their "retirement benefits are less valuable than they were before" the PRT. AC ¶ 7. In Plaintiffs' view, the PRT "immediately diminished the present value" of their benefits based on a comparison of Athene's "creditworthiness" with that of other PRT providers. AC ¶¶ 91-95, 128.[14]

This "present value" theory is equally foreclosed by *Thole*, which instructs that "the plan's value at any one moment" is irrelevant to the standing of defined-benefit plan participants, whose only interest is in receiving their promised fixed monthly payments. 590 U.S. at 540. In other words, the only "value" that matters for standing is the fixed monthly benefit Plaintiffs allege they are still receiving. That principle does not change because their defined benefit is now provided via an annuity. In this context, too, the "value" of the annuity "at any one moment" is irrelevant to Plaintiffs' standing because they continue to receive their promised payments. *Id.* Thus, the purported impact of "creditworthiness" on the "present value" of the annuity is a red herring.[15]

_____

[14] Plaintiffs also attempt to tie the allegedly diminished "present value" of their benefits to the change in payment *source*, from a GE-sponsored ERISA plan to an Athene annuity. But Plaintiffs are not entitled, by statute or contract, to remain participants in a GE plan. The decision to terminate (fully or partially) an ERISA plan is a settlor decision that is not governed by ERISA or its fiduciary obligations. *See* AC ¶ 3. Thus, any alleged injury stemming from the changed source of payment is not traceable to the challenged conduct—the choice of Athene.

[15] Plaintiffs' credit-risk theory is also too speculative on its face to satisfy Article III. The data cited by Plaintiffs—a NISA Investment Advisors report—is subject to significant fluctuation, and therefore speculative. While Plaintiffs allege a "credit risk" cost of 14% for Athene annuities based on a 2022 report, AC ¶ 92, NISA's most recent report shows that this "cost" has already declined to 4.2%. NISA, *PRT Credit Risk Monitor* (Jan. 17, 2025), https://tinyurl.com/3d984jf4.

More fundamentally, attempting to allege constitutional injury by quantifying the increased risk of harm through a "present value" calculation is misguided. "[T]he proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm"—a reduction in fixed monthly benefits—"as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1298 (D.C. Cir. 2007) (Kavanaugh, J.). Courts frequently reject similar efforts to establish standing based on the spurious proposition that a *risk* of harm that has not occurred becomes a present-day economic injury if quantified. *See*, *e.g.*, *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 887 (3d Cir. 2020); *James v. Johnson & Johnson Consumer Cos., Inc.*, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011); *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, 2022 WL 10197651, at *6 (E.D. Va. Oct. 17, 2022). Plaintiffs cannot effect an end-run around Article III by economically quantifying a threatened future injury that is not certainly impending.

### C.     Plaintiffs do not allege a certainly impending risk of default by Athene.

Plaintiffs try to further distinguish *Thole* by asserting that there is a "substantial risk" Athene will default and Plaintiffs will not receive their annuity payments. AC ¶¶ 7, 81, 116. This theory of standing also fails. *Thole* noted an argument by *amici* that plaintiffs could establish standing by alleging mismanagement "so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future benefits." 590 U.S. at 546. But the Court rejected that theory, which the plaintiffs had not "plausibly and clearly" alleged, explaining that "a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk" of plan-wide default. *Id*. Plaintiffs' "substantial risk of default" allegations are equally unsuccessful here. The Supreme Court has "repeatedly reiterated" that where a plaintiff does not rely on *past* injury but rather the threat of *future* injury, "that threatened

11

injury must be *certainly impending* to constitute injury in fact," and "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409-410 (emphasis in original) (brackets omitted).

Plaintiffs' hodgepodge of complaints about Athene's business practices do not plausibly allege that Athene's catastrophic financial collapse is certainly impending. Plaintiffs must allege that they are "'immediately in danger of sustaining some direct injury' as the result of the challenged" conduct. *City of L.A. v. Lyons,* 461 U.S. 95, 101-102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). They must cross the threshold from "the mere increased risk of some event occurring" to an "imminent harm." *Pub. Citizen*, 489 F.3d at 1297.

Far from facing "certainly impending" harm, Plaintiffs have myriad layers of protections to ensure they receive their benefits. First, there is Athene's essential contractual promise to pay Plaintiffs their benefits, backed by Athene itself, which Plaintiffs concede has a surplus and a positive surplus-to-liability ratio.  AC ¶ 59.

Second, GE transferred Plan assets to Athene, which are held in a "separate account," to fund the annuity. *See* AC ¶¶ 17, 77. Plaintiffs offer no facts that plausibly allege that the health of the *separate account*, which they acknowledge was funded by the Plan assets that purchased the annuities, is in danger of being unable to pay their pension benefits, let alone certainly impending or imminent danger.

Third, Athene's "separate account" structure insulates the assets that fund its obligations to Plaintiffs from Athene's general liabilities. AC ¶¶ 74, 77. And while insurers cannot support their "general account" liabilities using "separate account" assets, "general account" assets *can* be used to support "separate account" obligations, adding another layer of protection. AC ¶ 77; *Consultation Paper* 29.

Fourth, strict state insurance regulations require Athene to maintain specified reserve levels

to adequately support its annuity obligations and imposes auditing requirements to ensure compliance. *See* Iowa Code §§ 508.16, 511.8; N.Y. Ins. Law §§ 309, 1304, 1403, 1405.

Fifth, Athene protects annuitants by using reinsurance. AC ¶ 54.

And finally, if all those protections fail, Plaintiffs' annuities would be covered within SGA funding limits, which adds to the implausibility of Plaintiffs' standing. AC ¶¶ 33, 35.[16]  Indeed, considering a similar standing issue, the Fifth Circuit explained that "even where an employer is unable to cover underfunding [of a defined benefit plan], the impact on participants is not certain since the PBGC provides statutorily-defined protection of participants' benefits." *Lee*, 837 F.3d at 545. Similarly here, not only would Athene first bear the risk of the separate account failing to fully fund the annuities, but even if Athene were unable to cover all of its obligations, the impact on plaintiffs is not certain since SGAs provide protection for participants' benefits. Such "risk-based theories of standing [are] unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle." *Id*. at 546 (citation omitted).

Plaintiffs' substantial risk-of-default theory thus relies on a chain of entirely speculative possibilities:  (i) Athene would have to so egregiously mismanage the assets in *both* its separate account that funds the GE PRT *and* its general account that it cannot pay Plaintiffs' benefits; (ii) that mismanagement would have to escape insurance regulators; (iii) Athene's reinsurers would

---

[16] Plaintiffs contend that SGAs offer less protection than the PBGC because state law typically limits SGA benefits to $250,000 per annuitant. AC ¶ 35. That limit is not relevant to GE's partial PRT, which applied only to those with pension payments of less than $360/month. It would take almost 60 years at that maximum amount to exhaust SGA limits. Moreover, PBGC protection is not risk free. *See* Ben Miller, *GE Pension Threats Show Peril of Transfers to Insurers, Spinoffs*, Bloomberg Law (Apr. 12, 2024), https://tinyurl.com/5yy2bpts ("No annuitant has lost anything in the last 30-plus years, whereas PBGC did a 25-year study of 500 plans and found that participants had lost, because of the PBGC limits, $8.5 billion total."). Even "according to the PBGC," if a defined benefit pension plan "terminates in an underfunded state, [the] PBGC may not pay [participants] full benefits." *Alphin*, 704 F.3d at 338.

have to experience egregious mismanagement and failure; and (iv) the SGAs insuring Plaintiffs' benefits would have to fail.[17] Plaintiffs do not allege facts suggesting that *any* of these possibilities—much less *all* of them—is likely. This is precisely the type of "highly attenuated chain of possibilities" that *Clapper* held "does not satisfy the requirement that threatened injury must be certainly impending." 568 U.S. at 410; *Robainas v. Metro. Life Ins. Co.*, 2015 WL 5918200, at *6 (S.D.N.Y. Oct. 9, 2015) ("[A]bsent any real or impending injury …, [p]laintiffs' conclusory allegations of current risk do not suffice to confer Article III standing."), *aff'd sub nom. Ross v. AXA Equitable Life Ins. Co.*, 680 F. App'x 41, 45 (2d Cir. 2017).

The Fourth Circuit rejected similar "risk-based" standing arguments as overly speculative, where Plaintiffs alleged that a plan's "investment decisions diminished Pension Plan assets and thereby increased the risk that the Plan would fail and that their retirement benefits would be compromised." *Alphin*, 704 F.3d at 336. The Fourth Circuit explained that "if the Plan becomes underfunded [due to imprudent investment decisions], the [Plan sponsor] will be required to make additional contributions. If the [Plan sponsor] is unable to do so because of insolvency, participants' vested benefits are guaranteed by the PBGC up to a statutory minimum. Thus, the risk that Appellants' pension benefits will at some point in the future be adversely affected as a result of the present alleged ERISA violations is too speculative to give rise to Article III standing." *Id*. Other courts have taken the same approach. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1046 (8th Cir. 2020) (no "certainly impending" injury even though the benefit plan was "underfunded by hundreds of millions of dollars" because there were "sufficient assets to pay the Plan's benefits for 9.5 years"); *Sanzone v. Mercy Health*, 499 F. Supp. 3d 627, 631-32 (E.D. Mo. 2020)

---

[17] Notably, *Thole* indicates that the risk-of-default theory "might not be available" at all for those "whose benefits are guaranteed in full" by PBGC—the SGA equivalent. 540 U.S. at 546 n.2.

(allegations based on a "highly attenuated chain of possibilities" that the plan "*could* default," at the soonest "several years down the road" (emphasis in original)); *cf. Cappello v. Franciscan All., Inc.*, 2019 WL 1382909, at *2 (N.D. Ind. Mar. 27, 2019) (standing where a plan was allegedly underfunded by "more than $320 million" and lacked backup insurance); *Kaplan v. Saint Peter's Healthcare Sys.*, 2019 WL 1923606, at *5 (D.N.J. Apr. 30, 2019) (similar). Here, for the reasons described above, Plaintiffs rely on an even more speculative chain.

Plaintiffs' allegations do not undermine this conclusion. For example, consider Plaintiffs' assertion that Athene's backing by a private equity company renders its annuities risky. AC ¶¶ 7, 46-50. That assertion does not come close to suggesting that Athene's relevant separate account *and* its general account will both become so underfunded that they will be unable to support Athene's annuity obligations. Indeed, as Plaintiffs acknowledge, involvement with private equity is common in the industry, *id.* ¶ 49, and many insurers—including Global Atlantic Financial Group Ltd.—are supported by private equity.[18] It is also common for both private and public pension plans to be heavily invested in private equity.[19] Plaintiffs' distaste for private equity—an enormous segment of the nation's economy—is insufficient to demonstrate that Athene is on the verge of collapse merely because it is affiliated with Apollo, which separately undertakes investment in private equity. Likewise inadequate are Plaintiffs' allegations that a percentage of unrelated companies that are owned by private equity companies or their private equity funds (including Apollo or its private equity funds) have defaulted. AC ¶ 53. Purported ownership by private equity

---

[18] U.S. Dep't of the Treas., Fed. Ins. Off., *Annual Report on the Insurance Industry* 124-126 (2020), https://tinyurl.com/455x834u.

[19] *See Sulyma v. Intel Corp. Inv. Pol'y Comm.*, 909 F.3d 1069, 1077 (9th Cir. 2018), *aff'd*, 589 U.S. 178 (2020); GAO, *Defined Benefit Pension Plans* 19 (Feb. 2012), https://tinyurl.com/37wmvx5a (92% of large defined-benefit plans invested in private equity in 1992); Am. Inv. Council, *2022 Public Pension Study* 6, https://tinyurl.com/2vu428ab.

companies is too broad and vague a similarity to plausibly infer that Athene will imminently collapse (or that the many additional layers of protection will also fail). It is particularly inapt to compare a portfolio company owned by an Apollo private equity fund with an insurance company affiliated with Apollo (like Athene). Moreover, the default percentages that Plaintiffs allege are far lower than necessary to demonstrate a certainly impending collapse of any particular company.

Plaintiffs' allegation that Athene "has a high concentration of" assets like "loan-backed and structured securities" is similarly inadequate AC ¶ 63. Even accepting that allegation, it does not come near demonstrating that this high concentration means an Athene default is certainly impending, especially given insurance regulations governing assets held by insurers. The same goes for Plaintiffs' allegation that Athene sometimes draws assets from its separate accounts. AC ¶ 77. This policy is triggered only *when there is a surplus* in the separate accounts (*id.*)—if anything, the *opposite* of a sign of imminent collapse.[20]

The same is true of Plaintiffs' speculation that Athene's use of reinsurance and modified coinsurance means that Athene is underfunded, despite having $2 billion in surplus. AC ¶¶ 69-74. Courts in this circuit have dismissed analogous cases for lack of standing, rejecting these same arguments as "hypothetical, speculative, and uncertain." *Robainas*, 2015 WL 5918200, at *6 (citation omitted). In *Robainas,* the plaintiffs asserted that the defendant life insurance company "may be unable to pay their life insurance claims in the future" because of the way it used captive and offshore reinsurance to (allegedly) artificially bolster its risk-based capital ratio. *Id.* at *2-3, 6. Quoting *Clapper*, the court rejected this argument, holding that plaintiffs' allegations were too speculative and that no injury was "*certainly* impending." *Id.* (emphasis in original). Plaintiffs'

---

[20] Athene's policy works like defined-benefit plans in which "the employer, not plan participants, receives any surplus left over after all of the benefits are paid." *Thole*, 590 U.S. at 543.

allegations fail for the same reason.

The Amended Complaint's allegations about Bermuda-based reinsurers (AC ¶¶ 54-55, 67-69) also are conjectural. Bermuda is an established, well-regulated jurisdiction for insurance—in fact, it is one of only three jurisdictions (along with Switzerland and Japan) that have received qualified jurisdiction reciprocal status by the National Association of Insurance Commissioners ("NAIC").[21] Unsurprisingly, Bermuda reinsurers are commonly used by major life insurers like AIG, Allianz US, AXA US, MetLife, and Prudential,[22] many of whom Plaintiffs endorse as preferred providers. AC ¶ 92. Plaintiffs' complaints about Bermuda reinsurers' financial-reporting practices in no way suggest a certainly impending default of Plaintiffs' annuity benefits.

Finally, Plaintiffs attempt to allege a certainly impending injury by comparing Athene to insurers who have previously failed. AC ¶¶ 40, 42, 82-90. Plaintiffs' comparisons fall flat for three reasons: the regulatory landscape has experienced a massive overhaul since the collapse of Executive Life, the analogies are based on vague and overbroad characteristics, and Plaintiffs' own examples undercut their "substantial risk of default" theory of standing.

First, Plaintiffs fail to acknowledge the significant improvements in state regulation since the troubles with Executive Life, including overhauling the standardized valuation techniques used by NAIC (the standard-setting organization governed by the chief insurance regulators of the 50 states), the adoption of risk-based capital requirements, creating a NAIC accreditation program for states, and the enactment of individual state investment laws addressing investment risk. *See supra* note 3. Moreover, as Plaintiffs acknowledge, the regulatory landscape continues to evolve in light

---

[21] *See* NAIC, *NAIC List of Reciprocal Jurisdictions* (2019), https://tinyurl.com/5c2tu3z2.

[22] *See* sources cited *supra* note 12; CNO Fin. Grp., Inc., 2023 Annual Report (Form 10-K) (Feb. 23, 2024), https://tinyurl.com/57ac3x9h; Nat'l W. Life Grp., Inc., 2023 Annual Report (Form 10-K) (Feb. 29, 2024), https://tinyurl.com/yeyp8ybd.

of changes in the industry as a result of highly engaged and responsive regulators.[23] AC ¶ 69. Most recently, NAIC's Life Actuarial Task Force "endorsed adopting asset adequacy testing over reinsurance transactions." *Id.* Thus, Plaintiffs' suggestion that history will soon repeat itself with another Executive Life-type collapse is, understood in context, particularly implausible. Moreover, as discussed further below, these regulatory changes are reflected in the contemporary examples provided in the Amended Complaint and render them inadequate to establish standing.

Second, Plaintiffs' attempt to draw comparisons between Athene and contemporary insurers who have experienced financial difficulty also fall flat. The Amended Complaint's broad and vague comparisons—based on allegedly "complicated and intertwined financial obligation," the use of "offshore reinsurance" and "captive reinsurance," and investment in "risky and illiquid assets," AC ¶¶ 83, 85, 88—would sweep in large swaths of the insurance industry and cannot establish an imminent collapse. The Amended Complaint merely cherry picks alleged similarities to failed insurers without acknowledging that many (thriving) insurers across the industry share those same characteristics. And even so, the Amended Complaint's analogies at most speculate about a potential risk of failure *some day*; there are no allegations of a *certainly impending* injury. *See Clapper*, 568 U.S. at 410.

Third, Plaintiffs' own examples undercut their "substantial risk of default" theory. The examples evidence highly active regulators who stepped in to protect annuitants from losses. AC ¶¶ 84-85. Plaintiffs explain that regulators identified deficiencies in Columbian Life's reserves and ultimately took steps to rehabilitate it—but conspicuously fail to allege that the annuitants

---

[23] For example, NAIC continually updates its model regulations and a high percentage of States adjust their own laws to mirror those changes. *See* NAIC, *State Insurance Regulators Work to Protect Consumers Who Buy Annuities* (Nov. 1, 2020), https://tinyurl.com/5a5hwmkr ("40 states have now adopted the NAIC's February 2020 updates" to its model regulation).

experienced any financial loss whatsoever. Instead, Plaintiffs allege that "policyholders remain at substantial risk." AC ¶ 84. This and the similar PHL Variable example reinforce the speculative nature of Plaintiffs' allegations and that, in today's regulatory landscape, vague allegations of individual insurer characteristics do not support certainly impending injury in fact.  AC ¶ 85

In short, Plaintiffs' theory of risk relies on a long chain of contingencies, none of which is certainly impending individually, much less in combination. "[T]he Court cannot decide a case with a hypothetical injury that may never occur." *Waxman v. Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 288 (S.D.N.Y. 2016) (citation omitted). Plaintiffs must plausibly allege facts demonstrating that their failure to receive monthly pension benefits is certainly impending. They do not come close to meeting that standard here.

## II.    Plaintiffs do not plead any viable claims against the GE Defendants with respect to the selection of Athene.

To survive a motion to dismiss, a complaint must plead sufficient non-conclusory factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. This Court accepts well-pleaded allegations as true, but it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In ERISA class actions in particular, the Supreme Court has stressed that motions to dismiss are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp. v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "[T]he prospect of discovery in a suit claiming breach of fiduciary duty is ominous," raising the risk that even "groundless claim[s]" will "force a settlement." *PBGC v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (citations omitted). Thus, when evaluating plausibility in ERISA cases, courts must employ a "careful, context-sensitive scrutiny of a complaint's allegations," *Dudenhoeffer*, 573 U.S. at 425, giving "due regard to the range of reasonable judgments a fiduciary may make based on her experience

19

and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

Plaintiffs claims against the GE Defendants all fail under this standard. The selection of Athene—which is purportedly the basis for all of Plaintiffs' claims—was made by FCI, not the GE Defendants. And while Plaintiffs make half-hearted attempts to assert derivative claims against the GE Defendants (*e.g.*, that the GE Defendants should be held liable as knowing participants in FCI's alleged fiduciary breach), they do not offer any non-conclusory *factual* allegations that would support those claims. Nor do they allege viable underlying fiduciary-breach or prohibited-transaction claims to begin with. Plaintiffs' claims should all be dismissed.

### A.    Plaintiffs' fiduciary-breach and prohibited-transaction claims (Counts I and III) against the GE Defendants fail because the GE Defendants did not make the fiduciary decision to select Athene.

Plaintiffs' principal fiduciary-breach claim (Count I) and prohibited-transaction claim (Count III) are both premised on fiduciary action. *See* 29 U.S.C. § 1104 ("[A] fiduciary shall …."); *id.* §§ 1106(a)(1), (b) ("A fiduciary with respect to a plan shall not …."); *see also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Whether one "is an ERISA fiduciary must be determined by focusing on the function performed." *Blatt v. Marshall & Lassman,* 812 F.2d 810, 812 (2d Cir. 1987); *N.Y. State Teamsters Council Health & Hosp. Fund v. Centrus Pharm. Sols.*, 235 F. Supp. 2d 123, 126 (N.D.N.Y. 2002). And fiduciary status is not an all-or-nothing concept under ERISA—a person can be a fiduciary with respect to only some decisions, and can be held liable only "to the extent" he was vested with or exercised fiduciary authority as to the "action subject to complaint." *Pegram*, 530 U.S. at 226 (quoting 29 U.S.C. § 1002(21)(A)); *see Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014).

Counts I and III are non-starters against the GE Defendants because both of those claims are based on the selection of Athene, and Plaintiffs allege (correctly) that FCI, *not GE*, made that fiduciary decision. AC ¶ 22. And while Plaintiffs attack PRTs and GE's decision to engage in a

PRT, that decision cannot form the basis for their fiduciary claims. Plaintiffs also assert that PRTs result in a loss of ERISA and PBGC protections, and that GE desired to lower its pension obligations and PBGC insurance premiums, thereby potentially increasing revenues and profits. AC ¶¶ 115, 123, 127. But these grievances are the consequence of the *settlor* decision to transfer pension obligations (as Plaintiffs concede), not fiduciary decisions, and therefore are not governed by ERISA's fiduciary rules. AC ¶ 3; *Lee*, 837 F.3d at 538. Employers are *allowed* to make decisions out of self-interest when acting as a settlor. *Lockheed*, 517 U.S. at 890; *Hughes Aircraft*, 525 U.S. at 443-444.

As to the relevant *fiduciary* decision—the choice of Athene to effectuate the settlor decision—Plaintiffs allege that *FCI* made that choice. AC ¶ 22, 124, 141. Accordingly, as a matter of law, the GE Defendants cannot be held liable for violating ERISA's fiduciary-breach provisions or prohibited-transaction rules with respect to the selection of Athene. *Indep. Ass'n of Publishers' Emps., Inc. v. Dow Jones & Co.*, 671 F. Supp. 1365, 1367 (S.D.N.Y. 1987).

Plaintiffs attempt to brush aside the role of the independent fiduciary by asserting that FCI was not "independent" because it is "a for-profit business." AC ¶ 124. As an initial matter, that does not change FCI's fiduciary status. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1218 (2d Cir. 1987). In any event, it is difficult to imagine an investment consultant or independent fiduciary that is *not* a for-profit business, and there certainly is no support for the proposition that only *non-profit* independent fiduciaries are legitimate. Moreover, although ERISA *permits* fiduciaries affiliated with the plan sponsor to serve as fiduciaries, 29 U.S.C. § 1002(14)(A), plaintiffs in ERISA cases frequently fault plan fiduciaries for *not* retaining independent fiduciaries to make decisions. *See, e.g.*, *In re Fannie Mae 2008 ERISA Litig.*, 2012 WL 5198463, at *6 (S.D.N.Y. Oct. 22, 2012). Plaintiffs here cannot seriously suggest that the mere choice to engage

21

an independent fiduciary can generate a viable claim for breach of the fiduciary duties of prudence and loyalty. Indeed, DOL *encourages* plan fiduciaries to engage independent fiduciaries when effectuating plan sponsor PRT decisions. 29 C.F.R. § 2509.95-1(c)(6) ("Unless they possess the necessary expertise to evaluate such factors, fiduciaries would need to obtain the advice of a qualified, independent expert").

Because the GE Defendants did not act as the relevant fiduciaries, Plaintiffs cannot state a viable fiduciary-breach or prohibited-transaction claim against them.

**B.     Plaintiffs fail to allege the elements of derivative liability (Counts II and IV) against the GE Defendants.**

Plaintiffs also assert claims[24] against the GE Defendants for co-fiduciary liability, non-fiduciary "knowing participation" in FCI's alleged breaches, and failure to adequately monitor FCI's actions. AC ¶¶ 144, 145-148, 159-162. But these claims require Plaintiffs to plead facts demonstrating that the GE Defendants knew of, participated in, and/or enabled FCI's alleged ERISA violations. The Amended Complaint is devoid of any such allegations.

***Co-fiduciary and non-fiduciary liability.*** ERISA imposes liability on co-fiduciaries only when the co-fiduciary "has knowledge of a breach" of another fiduciary, "participates knowingly in" or conceals a breach by another fiduciary, or enables such a breach by a failure to comply with his or her own fiduciary obligations. 29 U.S.C. § 1105(a). Plaintiffs' non-fiduciary "knowing participation" claim similarly requires adequate allegations that the GE Defendants had knowledge of FCI's alleged breach and affirmatively acted in a way that enabled such a breach. *Tr. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016).

However, Plaintiffs do not plead *any* facts suggesting that the GE Defendants knew that

---

[24] These claims are encompassed primarily by Counts II and IV, but Count I also alleges co-fiduciary liability. AC ¶ 144.

FCI's process for selecting an annuity provider was allegedly deficient (or the selection of Athene purportedly objectionable), nor any action taken by the GE Defendants to participate in any alleged breach by FCI—aside from the decision to engage FCI as an independent fiduciary rather than have the named plan fiduciaries choose an annuity provider themselves. And as explained above, *see supra*, pp. 21-22, the decision to engage an independent fiduciary such as FCI (a decision that DOL itself encourages) is not *participation* in a fiduciary breach. Courts have consistently dismissed complaints, like Plaintiffs', that offer only bare conclusions of knowledge, participation, or enablement. *E.g.*, *DeLaurentis v. Job Shop Tech. Servs., Inc.*, 912 F. Supp. 57, 64 (E.D.N.Y. 1996); *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *14 (S.D.N.Y. Mar. 16, 2010); *Stein v. Smith*, 270 F. Supp. 2d 157, 175 (D. Mass. 2003). This Court should do the same.

   *Failure-to-monitor liability.* Plaintiffs' monitoring claim likewise fails. "The duty to monitor does not carry with it the duty to review an investment fiduciary's every decision." *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 671 (W.D. Pa. 2019). Instead, the duty to monitor is limited; one who appoints an ERISA fiduciary "is not exposed to liability *unless* something put [them] on notice of possible misadventure by their appointees." *Perez v. WPN Corp.*, 2017 WL 2461452, at *12 (W.D. Pa. June 7, 2017) (emphasis in original) (quotation marks omitted); *accord Scalia*, 417 F. Supp. 3d at 670. Here, Plaintiffs do not allege that the GE Defendants had any knowledge of any "misadventure" by FCI. Instead, they seem to assume that if FCI violated ERISA in its selection of Athene, then the GE Defendants could automatically be liable as well—or that the GE Defendants had an independent responsibility to review and reconsider all decisions made by FCI. AC ¶¶ 161-162. "[T]hat standard would defeat the purpose of" having an independent fiduciary select an annuity provider "in the first place," and this Court should reject it. *Perez*, 2017 WL 2461452, at *14; *Scalia*, 417 F. Supp. 3d at 671.

### C. Plaintiffs' derivative claims fail because Plaintiffs do not plead viable fiduciary-breach or prohibited-transaction claims with respect to the selection of Athene by FCI.

Even if Plaintiffs had adequately alleged the elements of derivative liability, Plaintiffs' derivative claims against the GE Defendants fail for an additional reason: "derivative claims … cannot survive absent a viable" underlying claim, *Coulter*, 753 F.3d at 368, and Plaintiffs do not plead viable underlying claims against FCI. The GE Defendants agree with, and incorporate by reference, the arguments made by FCI about why Plaintiffs' underlying fiduciary-breach and prohibited transactions claims fail. *See* FCI MTD 11-25.

## III. Plaintiffs lack statutory standing to sue under 29 U.S.C. §§ 1132(a)(2) and (a)(3).

Plaintiffs bring their claims under three provisions: 29 U.S.C. §§ 1132(a)(2), (3), and (9), which each differ in the form of relief they permit. AC ¶¶ 5-7, 143, 146-148, 156. Sections 1132(a)(2) and (a)(3) permit the recovery of losses and disgorgement of profits to the plan, as well as injunctive relief. Section 1132(a)(9), which was enacted specifically to address ERISA violations in the context of PRTs, provides more limited relief "to assure receipt ... of the amounts provided or to be provided by" the annuity, such as "the posting of security if necessary."

Plaintiffs cannot state claims pursuant to §§ 1132(a)(2) and (a)(3) because § 1132(a)(2) allows civil actions only "by the Secretary, or by a participant, beneficiary or fiduciary" and § 1132(a)(3) allows civil actions only "by a participant, beneficiary, or fiduciary." Plaintiffs are not suing as participants or beneficiaries because, as they concede, the PRT "terminated" "their status as Plan participants." AC ¶ 115.[25] Nor can Plaintiffs establish that they "may become eligible to receive a benefit of any type" (and thus be deemed participants), because this suit does

---

[25] Plaintiff David Bueno alleges that he is a "current participant" based on his prior employment at GE, which presumably earned him pension benefits that have not been transferred to Athene. AC ¶ 15. But here, he is suing only over pension benefits promised to his wife, as to which he is a former beneficiary. *Id.* Thus, his purported status as a "current participant" is irrelevant here.

not involve a claim for "benefits." 29 U.S.C. § 1002(7); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 101 (2d Cir. 2005). "The word 'benefits' is a term of art and refers to vested ERISA plan benefits as opposed to, for example, compensatory damages for a breach of a fiduciary duty …." *Bilello v. JPMorgan Chase Ret. Plan*, 592 F. Supp. 2d 654, 663 (S.D.N.Y. 2009). Plaintiffs do not seek "benefits"; they seek disgorgement, which is a statutory remedy, not an entitlement derived from the terms of a plan. *See Coan v. Kaufman*, 457 F.3d 250, 255 (2d Cir. 2006). For former participants like Plaintiffs, there is one express and exclusive cause of action: 29 U.S.C. § 1132(a)(9). Their claims for disgorgement under §§ 1132(a)(2) and (a)(3) should be dismissed.

## IV.    Plaintiffs' claims against Lawrence Culp should all be dismissed.

Plaintiffs name GE Aerospace's Chairman and CEO, Larry Culp, as the only individual defendant. All claims against Mr. Culp should be dismissed for reasons similar to those discussed above. Plaintiffs do not allege that GE's CEO selected Athene; they allege FCI did. AC ¶ 22, 124, 141. Nor do Plaintiffs offer anything beyond naked assertions that Mr. Culp knowingly participated in others' alleged breaches, or failed to monitor those who selected Athene. AC ¶¶ 148, 160-162. "[T]he assertion of multi-million dollar claims" under ERISA against individual committee members "has the tremendous power to harass … because they will be required to list the lawsuit on every auto, mortgage or student financial aid application they file." *Cunningham v. Cornell Univ.*, 2018 WL 1088019, at *1 (S.D.N.Y. Jan. 19, 2018). Plaintiffs have not alleged any facts regarding Mr. Culp's conduct, and the claims against him should be dismissed.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.

Dated: February 19, 2025

Respectfully submitted,

/s/ *Jaime A. Santos*
Jaime A. Santos (*pro hac vice*)
Isabel M. Marin (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street NW
Washington, D.C. 20036
Tel.: (202) 346-4000
JSantos@goodwinlaw.com
IMarin@goodwinlaw.com

James O. Fleckner (Bar No. 700852)
Alison V. Douglass (*pro hac vice*)
Benjamin S. Reilly (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
JFleckner@goodwinlaw.com
ADouglass@goodwinlaw.com
BReilly@goodwinlaw.com

*Counsel for General Electric Company, the Board of Directors of General Electric Company, H. Lawrence Culp, Jr., and the General Electric Company Pension Board*

## <u>CERTIFICATE OF SERVICE</u>

I, Jaime A. Santos, certify that a copy of the foregoing document, filed through the

CM/ECF system, will be sent electronically to the registered participants as identified on the

Notice of Electronic Filing (NEF) on February 19, 2025.

Dated: February 19, 2025                    <u>/s/ *Jaime A. Santos*</u>
                                             Jaime A. Santos

27